**The NAVAJO TRIBE OF INDIANS**

v.

**The UNITED STATES.**

**Nos. 69, 299.**

United States Claims Court.

Dec. 3, 1985.

---

See also, 9 Cl.Ct. 336.

Paul D. Barber, Albuquerque, N.M., for plaintiff; Rodey, Dickason, Sloan, Akin & Robb, of counsel.

Robert E. Fraley, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, for defendant; James M. Upton, of counsel.

## OPINION

LYDON, Judge:

Plaintiff, the Navajo Tribe of Indians (hereinafter the Tribe), is a tribe of American Indians which has a tribal organization recognized by the Department of the Interior. The Tribe initially brought these actions in the Indian Claims Commission in 1950 and 1951 under Section 2 of the Indian Claims Commission Act, as amended, 25 U.S.C. § 70a (1976). Thereafter, plaintiff's actions were transferred to the United States Court of Claims, this court's predecessor, on January 3, 1977, pursuant to the Act of October 28, 1976, 90 Stat. 1990, 25

U.S.C. § 70v (1976). In substance, plaintiff seeks damages from defendant contending that defendant's mismanagement of certain of the Tribe's natural resources constituted a breach of the fiduciary duty and obligation owed the Tribe by defendant arising from the trust relationship between the Tribe and defendant. The Tribe's natural resources at issue here are vanadium, uranium, copper, rock, sand and gravel.[1] The matter has been fully tried, briefed and argued. The court concludes that plaintiff is entitled to recover in the manner set forth below. The claims herein are only part of numerous claims asserted by plaintiff against defendant in these two cases (Docket Nos. 69 and 299). Resolution of the presented claims does not serve to terminate the docketed litigations.

## I.

The Navajo Indian Reservation, which was created by the Treaty of 1868, 15 Stat. 673, 677, is located in parts of New Mexico, Arizona and Utah. Legal title to the Reservation was held by the United States in trust for the Tribe at all times material herein. The Tribe was the beneficial owner, in possession of the Reservation, at all times material herein. *See Navajo Tribe of Indians v. United States,* 176 Ct.Cl. 502, 550–51, 364 F.2d 320 (1966). The natural resources in issue were at all relevant times within the boundaries of the Reservation.[2] As a result, the natural resources on the Reservation, like the Reservation itself, were held by the United States in trust for the Tribe. The Tribe was the beneficial owner of these natural resources.

▮ As noted in *Navajo Tribe of Indians v. United States, supra,* 176 Ct.Cl. at

---

1. Defendant concedes that plaintiff is entitled to be paid royalties, as claimed by plaintiff under nine sand, rock and gravel permits or leases granted prior to August 13, 1946, of $2,257.89. Defendant further concedes that plaintiff is entitled to be paid royalties, as claimed by plaintiff under two leases for copper mining for the year 1943, of $292.00.

2. The claims in issue arose out of a demand for a general accounting set forth in the petition in

Docket No. 69 before the Indian Claims Commission in 1950. Following transfer of these cases from the Indian Claims Commission to the Court of Claims in 1977, defendant, pursuant to a trial judge's order, filed its accounting report on March 16, 1981, covering, *inter alia,* the natural resource items in issue. Thereafter, plaintiff filed its exceptions to this accounting report on March 11, 1982, challenging defendant's handling of these resources.

554, F. 6(a), 364 F.2d 320: "At all times material to this action, the defendant had a responsibility to supervise the affairs of the Tribe, which is prohibited by law from alienating its property without the defendant's consent." *See e.g.,* 25 U.S.C. § 177 (1976). *See also* Treaty of September 9, 1849, 9 Stat. 974, II C. Kappler 583 (2d ed. 1900), Treaty of June 1, 1868, 15 Stat. 667, II C. Kappler 1015 (2d ed. 1904). From the creation of the reservation, certain rights and responsibilities arose. One of the rights which plaintiff obtained was the right to the natural resources on its tribal reservation lands. *See Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 186, 624 F.2d 981, 988–89 (1980). The creation of the Reservation also placed certain responsibilities on defendant since it had control and supervision over tribal resources. The Court of Claims has found that "a special or fiduciary relationship" exists "between the Government and the plaintiff Navajo Tribe with respect to tribal property. *See Navajo Tribe, supra,* 176 Ct.Cl. at 507, 364 F.2d at 322." *Navajo Tribe of Indians v. United States, supra,* 224 Ct.Cl. at 187, 624 F.2d at 989. This special trust relationship and the responsibilities it creates covers the tribal natural resources in issue in this case. *See Id.* The holding of the Supreme Court in *United States v. Mitchell* (Mitchell II), 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) serves to confirm these legal holdings.[3]

Having concluded that defendant by virtue of its special trust relationship with the plaintiff Navajo Tribe had a fiduciary responsibility relative to dealings involving the Tribe's natural resources, it is now necessary to determine if defendant breached that responsibility as alleged by plaintiff.

Plaintiff's actions can be broken down into five separate claims. Each of these claims is premised on defendant's breach of a fiduciary obligation it owed the Tribe under the special trust relationship between defendant and the Tribe. The factual basis for plaintiff's first claim is defendant's failure to require the payment of minimum annual rentals on three vanadium—uranium leases during the period 1942–1944. The second claim rests on the assertion that defendant conducted exploration operations for uranium on the Tribal Reservation during the period 1942–1946, without plaintiff's permission and without any payment to plaintiff relative thereto. The factual predicate for plaintiff's third claim is the condition of certain mines, failure to close or clean up, which were opened on the Tribal Reservation for the removal of vanadium or uranium-bearing ores during the period 1938–1946 and thereafter. The fourth claim is based on the fact that defendant failed to pay the Tribe for uranium which it removed from residual mill tailings which came from ore extracted from the reservation. The fifth claim had its genesis in the construction and operation of four uranium processing mills on the Tribal Reservation and is based on the potential health hazards created by large piles of uranium tailings resulting from the milling process and defendant's failure to ameliorate such hazards. In addition, plaintiff seeks to recover interest on some of these claims.

## II.

### A. *Lease Rental Issue*

 Under its first claim, plaintiff contends that defendant breached its fiduciary duty by failing to collect certain rental

---

**3.** Defendant contends that a specific fiduciary obligation can exist only where imposed by treaty, statute, executive order, agreement or contract. From this broad contention, defendant suggests that there is no specific fiduciary obligation on defendant relative to its actions regarding the natural resources at issue in these cases. Such a broad argument was rejected by the Court of Claims in *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 183, 624 F.2d 981,

987 (1980). Defendant's supervision and control over plaintiff's natural resources begot a fiduciary relationship supported by all the elements of a common-law trust, *i.e.,* a trustee (the United States), a beneficiary (the Navajo tribe), and a trust corpus (Indian natural resources— vanadium, uranium, copper, sand, rock and gravel). *See United States, v. Mitchell* (Mitchell II), 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983).

payments during the period 1942–1944 from entities involved in mining operations on its reservation. Specifically, plaintiff contends that defendant failed to collect certain rental fees under three leases from the lessees during the period in which the lessees were prospecting for ore reserves. Generally, if a trustee fails to collect rents which he should collect he may be held liable for such a breach of duty. G Bogert, *The law of Trusts and Trustees*, § 799 (2d ed. 1981). In determining whether defendant did breach such a duty, it is necessary to review the statutory and regulatory history of the program of leasing Indian Reservation lands to entities for mining purposes.

Section 26 of the Act of June 30, 1919, 41 Stat. 31, authorized the Secretary of the Interior to lease to any citizens, associations, and corporations unallotted lands within certain Indian Reservations [4] for the purpose of mining for minerals. The Act further provided in pertinent part:

That after the passage and approval of this section, unallotted lands, or such portion thereof as the Secretary of the Interior shall determine, within Indian reservations heretofore withheld from disposition under the mining laws may be declared by the Secretary of the Interior to be subject to exploration for the discovery of deposits of gold, silver, copper, and other valuable metalliferous minerals by citizens of the United States, and after such declaration mining claims may be located by such citizens in the same manner as mining claims are located under the mining laws of the United States: *Provided,* That the locators of all such mining claims, or their heirs, successors, or assigns, shall have a preference right to apply to the Secretary of the Interior for a lease, under the terms and conditions of this section, within one year after the date of the location of any mining claim, and any such locator who shall fail to apply for a lease within one year from the date of location shall forfeit all rights to such mining claim: * * *

* * * * * *

That leases under this section shall be for a period of twenty years, with the preferential right in the lessee to renew the same for successive periods of ten years upon such reasonable terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the time of the expiration of such periods: * * *

* * * * * *

That for the privilege of mining or extracting the mineral deposits in the ground covered by the lease the lessee shall pay to the United States, for the benefit of the Indians, a royalty which shall not be less than 5 per centum of the net value of the output of the minerals at the mine, due and payable at the end of each month succeeding that of the extraction of the minerals from the mine, and an annual rental, payable at the date of such lease and annually thereafter on the area covered by such lease, at the rate of not less than 25 cents per acre for the first calendar year thereafter; not less than 50 cents per acre for the second, third, fourth, and fifth years, respectively; and not less than $1 per acre for each and every year thereafter during the continuance of the lease, except that such rental for any year shall be credited against the royalties as they accrue for that year.

That in addition to the payment of the royalties and rentals as herein provided the lessee shall expend annually not less than $100 in development work for each mining claim located or leased in the same manner as an annual expenditure for labor or improvements is required to be made under the mining laws of the United States: *Provided,* That the lessee shall also agree to pay all damages occasioned by reason of his mining operations to the land or allotment of any Indian or

---

4. The Act included the unallotted lands within the Indian Reservations in the States of Arizona, California, Idaho, Montana, Nevada, New Mexico, Oregon, Washington, or Wyoming.

to the crops or improvements thereon: * * *

* * * * * *

That all moneys received from royalties and rentals under the provisions of this section shall be deposited in the Treasury of the United States to the credit of the Indians belonging and having tribal rights on the reservation where the leased land is located, which moneys shall be at all times subject to appropriation by Congress for their benefit, unless otherwise provided by treaty or agreement ratified by Congress: *Provided,* That such moneys shall be subject to the laws authorizing the pro rata distribution of Indian tribal funds.

That the Secretary of the Interior is hereby authorized to perform any and all acts and to make such rules and regulations not inconsistent with this section as may be necessary and proper for the protection of the interests of the Indians and for the purpose of carrying the provisions of this section into full force and effect: * * *

It is uncontested that the Act of 1919 allowed prospectors to search for the specified minerals on Indian Reservations at no rental charge. Once such prospectors discovered potential mineral sources, they were able to file mining claims. They were then given preferential rights to obtain leases. For the privilege of conducting mining and extracting operations, the entities involved were required to pay over to the United States, for the benefit of the Indians, certain royalty payments based on their mineral output. They were also required to make rental payments of varying amounts depending on the year of the lease.

From 1919 until 1936, pursuant to the Act of 1919, the defendant granted four leases for the mining of radium and other minerals on the Navajo Reservation. The four companies which acquired these leases were not required to pay rent for the time period during which they only prospected on said lands. These mining leases were not very productive principally because of the lack of a radium market in the United States and the lower grade of the reservation ore. On March 25, 1936, the Secretary of the Interior closed Indian Reservation lands to further prospecting. Sometime in 1936 or 1937, the Navajo Tribal Council passed a resolution requesting the Secretary of the Interior to investigate the extent and value of carnotite deposits on its reservation lands and the potential royalties which could accrue to the Tribe if said lands were mined. After March 26, 1936, and before 1938, the Tribal Council, itself, reviewed lease applications and generally rejected them by majority vote.

On May 11, 1938, Congress passed a new law governing the leasing of Indian lands for mining purposes. (Act of May 11, 1938, 52 Stat. 347). This Act provided in pertinent part:

That hereafter unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction, except those hereinafter specifically excepted from the provisions of this act, may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities.

* * * * * *

Sec. 4. That all operations under any oil, gas, or other mineral lease issued pursuant to the terms of this or any other act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior. * * *

Neither this very general statute nor the regulations which were to bring into effect the promulgated Act addressed the issue of prospecting. The regulations, however, did provide the necessary details for implementing the new law.

The regulations provided in pertinent part:

## HOW TO ACQUIRE LEASES

Sec. 2. *Tribal Council may Authorize Leases to be Made.* The Tribal Council of any Indian tribe, speaking for such Indians by resolution properly authenticated, may authorize the Secretary of the Interior to advertise the sale of leases for mining purposes on their tribal lands not needed for farming or agricultural purposes. Except where a tribe is authorized to execute its own leases pursuant to tribal constitution and charter adopted and approved pursuant to provisions contained in the act of June 18, 1934 (48 Stat. 984), the act of May 1, 1936 (49 Stat. 1250) or the act of June 26, 1936 (49 Stat. 1967), the Secretary of the Interior may thereafter authorize and empower any person to be by him designated to execute for and on behalf of any tribe, and subject to his approval, all leases on such lands for oil and gas or other mining purposes.

\*　\*　\*　\*　\*　\*

## ACREAGE LIMITATION

Sec. 9(c) For beds of placer gold, gypsum, asphaltum, phosphate, iron ores, or other useful minerals other than coal, oil, and gas, not more than 960 acres.

## TERM OF LEASES

Sec. 10. Oil and gas mining leases shall be made for periods of ten years from the date of approval by the Secretary of the Interior and as much longer as the substances specified in the lease are produced in paying quantities.

Leases for minerals other than oil and gas shall be for a period of ten years.

\*　\*　\*　\*　\*　\*

## RENTS AND ROYALTIES

Sec. 12. *Manner of Payments.* Except where otherwise provided by the terms of leases where the tribes are organized under the act of June 18, 1934 (48 Stat. 984), all rents and other payments due under leases which have been or may be approved by the Secretary of the Interior shall be paid to the superintendent or to such other person as may be designated by the Secretary of the Interior, for the benefit of the lessors. Except advance payments for the first year which shall be sent direct to the superintendent at the time of filing leases, payments of rental and royalty under leases shall be transmitted through the supervisor, shall be accompanied by a statement by the lessee, in triplicate, showing the specific items of rental or royalty that the remittance is intended to cover, and shall be made at such time or times as the lease provides.

In the event of the discovery of minerals in paying quantities all advance payments shall be allowed as credit on stipulated royalties for the year for which such advance payments have been made. No refund will be made under oil, gas, or other mining leases, in the event that royalty from production is not sufficient to equal the advance payment, nor will any part of the moneys so paid be refunded to the lessee because of any subsequent surrender or cancellation of the lease, nor shall the lessee be relieved from the obligation to pay said advance rental annually when it becomes due, by reason of any subsequent surrender or cancellation of the lease.

\*　\*　\*　\*　\*　\*

Sec. 14. *Annual Rentals and Expenditures for Development on Leases other than Oil and Gas.* Lessees other than oil and gas lessees shall pay on all leases annually in advance for the first calendar year or fraction thereof a rent of 25 cents per acre; for the second and third years, 50 cents per acre; and for the fourth and each succeeding calendar year $1 per acre.

\*　\*　\*　\*　\*　\*

On all leases of class (c) referred to in section 9 of these regulations, there shall be expended annually in actual mining operations, development, or improvements upon the land leased, or for the benefit thereof, a sum which with the annual rental, shall amount to not less

than $100 for each 160 acres or fraction thereof included in the lease.

\* \* \* \* \* \*

Sec. 15. *Royalty Rates for Minerals other than Oil and Gas.* For substances other than gold, silver, copper, lead, zinc, tungsten, coal, asphalt and allied substances, oil and gas, the lessee shall pay quarterly or as otherwise provided in the lease, a royalty of not less than ten per cent of the value, at the nearest shipping point, of all ores, metals, or minerals marketed.

\* \* \* \* \* \*

### EFFECTIVE DATE OF THESE REGULATIONS

Sec. 28. These regulations shall become effective and in full force from and after the date of approval, and shall be subject to change or alteration at any time by the Secretary of the Interior: \* \*

### FORMS

Sec. 30. Applications, leases, and other papers must be upon forms prescribed by the Secretary of the Interior \* \* \*.

These regulatory provisions were similar to the statutory requirements under the Act of June 30, 1919, *supra*, especially with regards to rental payments. These regulations were approved by the Secretary of the Interior on May 31, 1938.

Pursuant to Section 2 of the regulations, *supra*, promulgated under the Act of May 11, 1938, the Navajo Tribal Council on November 21, 1939, initially approved, by resolution, the leasing of tribal land for mining purposes. Subsequently, on April 9, 1941, the Tribal Council passed a second resolution requesting the Secretary of the Interior in pertinent part "to lease *proven mineral lands under Departmental Regulations* to the highest bidder, for mining purposes \* \* \*." (Emphasis added.) This resolution was unanimously approved and was certified as required by the regulations.

In a November 13, 1941, letter to the Commissioner of Indian Affairs, members of the Navajo Tribal Council submitted their interpretation of the scope of the April 9, 1941, resolution cited above. The letter stated in pertinent part:

It was the intent of the Tribal Council to delegate to the Secretary of the Interior authority to approve mining leases as he was in a much better position than they to make more profitable lease arrangements. Because the Council met but twice a year such methods would also be quicker. In the interests of national defense as stated in the Council resolution, this would appear to be very important at this time because of the great demand for critical minerals such as vanadium and copper.

By leasing to the highest bidder, the Tribal Council desired to have the Secretary obtain competitive bids and thus realize the highest possible financial return to the tribe, recognizing that in some cases this objective might be reached through negotiation rather than by formal invitation and bid.

By proven mineral lands is meant lands which in the opinion of the Secretary's Office and the Geological Survey contain minerals of potential commercial value.

The court notes that the United States Geological Survey viewed proven mineral reserves as the most certain type of reserve which can be blocked off on three sides and actually taped.

In implementing the Act of May 11, 1938, and the regulations promulgated pursuant thereto, a problem arose. As stated earlier, neither the 1938 Act nor its regulations provided for prospecting in order to establish proven reserves. Prospecting was included under the Act of June 30, 1919, but that crucial phase of mineral development was omitted from the 1938 Act and its regulations. As a result, the only two leases approved under the 1938 regulations prior to the end of 1941 were leases cover-

ing acreage which had been previously explored under the authority of the 1919 Act.[5]

In order to resolve the problem created by the failure of the 1938 statute and regulations to provide for prospecting as the 1919 Act had done, the Secretary of the Interior instituted the use of "exploratory mining leases". Such leases encompassed areas far in excess of the acreage limits set out in the regulations. *See supra* Section 9(c). The lessee was given the opportunity to prospect in this larger area to pinpoint a mineralized area it wished to further explore and mine. Once the prospecting was completed, usually within a year, the area covered by the lease was reduced by modification to the initial lease agreement to cover only the mineralized acreage within the regulatory 960-acre limit. No rental payments were charged during the prospecting period though the leases required minimum expenditures for prospecting. However, once the area was reduced to within the regulatory maximum acreage an annual rental fee of $1.00 per acre was required. This rental payment was to be credited against royalties accruing in that particular year.

Plaintiff contends that the Secretary's practice under these exploratory mining leases of failing to collect rental payments from the date the lease was approved at the annual rates set out in the regulations (*see supra* section 14) violated the fiduciary duty owed to plaintiff to realize the highest possible financial return for the tribe which it contends included the regulatory rental payments. Plaintiff asserts that defendant breached its fiduciary duty with regard to three leases approved by the Secretary. These three leases included two leases to Vanadium Corporation, I–149–IND–5456

("5456") and I–149–IND–5705 ("5705") and one lease to Curran Bros. and Wade, I–149–IND–6197 ("6197").

Plaintiff also maintains that defendant was legally bound to comply with the provisions of the 1938 Act and the regulations thereunder (*see Service v. Dulles*, 354 U.S. 363, 388–89, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957)) and defendant's failure to collect the prescribed incremental rental payments while the lessees were prospecting for minerals was a violation of that Act and regulations. Plaintiff also asserts that defendant's position as the primary purchaser of ores containing vanadium created a conflict-of-interest situation for it. Plaintiff contends that defendant's practice of not requiring rental payments while companies prospected for ore kept the price defendant was required to pay for vanadium down and created a situation in which the government preferred its own monetary interests over the interests of the Tribe. *See Navajo Tribe of Indians v. United States*, 222 Ct.Cl. 158, 164, 610 F.2d 766, 768–69 (1979). As per plaintiff's contention regarding any self-dealing or conflict-of-interest surrounding defendant's decision to allow prospecting on the Navajo Reservation without charging a rental fee, the court finds no persuasive support in the record for that argument. For a more detailed discussion concerning plaintiff's conflict of interest theory see subpart B of this opinion.

It is undisputed that the Secretary did not require a minimum annual rental fee for the portion of those three leases when the lessees were only prospecting for mineral reserves and that the rent eventually paid did not cover all of the acreage initially covered under the three leases.[6] In or-

---

**5.** The first such lease (I–149–IND–3798) was executed on December 4, 1939, and approved by the Secretary of the Interior on January 1, 1940. The second such lease (I–149–IND–4225) was executed on April 5, 1940 and approved by the Secretary of the Interior on May 9, 1940. Both leases were to Wade, Curran and Redington. Both leases encompassed small amounts of previously-explored acreage (65.02 acres and 41.32 acres respectively).

**6.** Plaintiff's position basically is that defendant, once it entered into leases allowing prospecting and mining on the reservation, had an obligation to collect rental payments of $.25 per acre during the first calendar year that the lease was approved and then $.50 per acre for the second year and so forth consistent with Section 14 of the 1938 regulations. *See Navajo Tribe of Indians v. United States*, 222 Ct.Cl. 158, 164, 610 F.2d 766, 768–69 (1979). Plaintiff maintains that these regulatory rental amounts were due

der to determine whether defendant did breach its fiduciary, statutory and/or regulatory obligations, it is necessary to ascertain, given the pertinent statutes, regulations and the Indian resolution and correspondence, the extent of defendant's obligation to collect rent.

Initially, it is to be noted that plaintiff raises matters which are somewhat irrelevant to the issue of whether, on the three leases in question, defendant improperly failed to collect rentals for the years 1942–1944. First, plaintiff claims that defendant violated section 10 of the regulations which specified that leases shall be for a period of 10 years. The leases in question were all issued in 1942 or 1943. Accordingly, the 10-year term covered by the regulation would expire in 1952 or 1953. The claim period herein is 1942–1944. Thus, any violation of the lease in this regard would be immaterial to the issue of lease rental payments in this case. Moreover, the 1938 Act, *supra,* upon which the regulations were based, provided that the terms of the leases in issue should not "exceed ten years and as long thereafter as minerals are produced in paying quantities." Thus, in any event, the basic mining statute provided for leases in excess of 10 years or less than 10 years. The quoted language, *supra,* was made a part of the leases in issue and the 1938 Act and the regulations implementing the Act clearly allowed the Secretary to so extend the leases or restrict them to less than 10 years. Next, plaintiff claims defendant violated the regulation's lease acreage limitation of 960 acres (Sec. 9(c)). The regulations provided that mineral *"beds"* should not exceed 960 acres. It is true that the leases in question initially exceeded 960 acres. However, within a year, each lease, when a mineral *bed* had been located and established, was reduced in acreage to 960 or less acres. A rational and reasonable reading of the 1938 Act and

the implementing regulations shows that the acreage limitation was limited to mining *beds,* definite and ascertainable *beds* of minerals. The limitation was not applicable to prospecting acreage. Reasonably read, there was no violation of the regulations in this regard. Finally, plaintiff claims defendant violated the regulations in not paying the annual rental rates set out in section 14 thereof, *e.g.,* $.25 per acre for the first year of the lease, for prospecting for minerals. A contemporary reading of the regulations in accord with the custom and tenor of the times when the leases were issued and the totality of the existing circumstances persuades that there was no significant and actionable violation of the rental provision or any other part of the regulations. Even if one were to find technical violations in the leases as drafted, the record persuades no detriment was suffered by plaintiff as a result. Further, the Secretary was permitted to alter the leases by the very regulations which plaintiff claims he violated. *See in this regard* Note 11, *infra,* and cases cited therein. More importantly, there is no persuasive evidence in the record that the Secretary's action in this regard breached any fiduciary obligation owed the Tribe or otherwise was not beneficial to the tribe.

Having reviewed the record, the 1919 Act, the 1938 Act and regulations promulgated pursuant thereto, as well as the April 9, 1941 Navajo Tribal Council resolution, the court concludes that defendant's general fiduciary obligation was to develop a mineral lease program which would provide the highest possible financial return to plaintiff. Such a financial return would result from rents paid on the leased acreage, and the royalties paid on the mineral output. The record clearly indicates, however, that the primary source of revenue

---

on all of the acreage under the lease until the leasehold acreage was reduced. Plaintiff also contends that the rental payments were required whether the lessee was prospecting or

actually mining for ore. For reasons set out *infra,* the court does not concur that defendant had such a fiduciary obligation, and in fact,

from the mineral leases was to be the royalties.[7]

Despite this primary emphasis on royalty payments, the Secretary did have an obligation to collect rental payments on the leased property. Based on the entire record, the court is convinced that the Secretary was not obligated to collect rent during a period in which only prospecting was being carried out. However, as soon as mining operations began the Secretary did have an obligation to collect rent. In this case, the court finds it fair and reasonable, given the record in this case, to conclude that defendant had a fiduciary duty to begin collecting rent on the regulatory limited acreage area when the lessee became obligated to pay royalties on its ore output.

The court finds support for its conclusion that defendant had no duty to collect rent during the time in which the lessee was merely prospecting in the 1919 and 1938 Acts. It is uncontested that under the 1919 Act no rental payments were due during the time an entity was prospecting. It is also clear that the 1938 Act and its regulations did not address the issue of prospecting. Therefore, the court finds it reasonable to infer from Congress' total silence on the issue of prospecting in the 1938 Act that it did not intend that mining concerns be charged rent during periods in which they were prospecting. The 1938 Act referred to leases "for mining purposes" and the court finds it reasonable to interpret that provision as excluding a requirement to pay rent for prospecting given the unrepealed provisions of the 1919 Act relating to prospecting.

Plaintiff argues that the 1919 Act should not be considered and that the 1938 Act and the regulations thereunder should completely dictate defendant's statutory and regulatory obligations. Plaintiff cites the

following Supreme Court decision in support of its position that only the 1938 Act and not the 1919 Act should govern in this case. In affirming the Ninth Circuit Court of Appeals' decision (729 F.2d 1192), the Supreme Court stated in *Montana v. Blackfeet Tribe*, —— U.S. ——, 105 S.Ct. 2399, 85 L.Ed.2d 753 (Sup.Ct.1985):

> As the Court of Appeals recognized, Congress had three major goals in adopting the 1938 Act: (i) to achieve 'uniformity so far as practicable of the law relating to the leasing of tribal lands for mining purposes.' Senate Report 2; H.R.Rep. No. 1872, 75th Cong., 3d Sess., 1 (1938); (ii) to 'bring all mineral-leasing matters in harmony with the Indian Reorganization Act,' Senate Report 3; H.R.Rep. No. 1872, *supra,* at 3; and (iii) to ensure that Indians receive 'the greatest return from their property.' Senate Report 2; H.R. Rep. No. 1872, *supra,* at 2. [*Id.* at —— n. 5, 105 S.Ct. at 2403–04 n. 5]

Plaintiff first argues that incorporation of the prospecting provisions of the 1919 Act into the 1938 would create disharmony. Plaintiff asserts that "uniformity" in the regulation of leasing tribal lands for mining purposes was achieved by placing all unallotted Indian lands under the province of the 1938 Act as opposed to only specific Indian lands as covered in previous Acts. That fact is not enlighting relative to the issue of rental fees for prospecting presently before the court. Uniformity, plaintiff argues, was also promoted by a repealer clause in the 1938 Act which stated: "All Act [sic] or parts of Acts inconsistent herewith are hereby repealed." Section 7 of Act of May 11, 1938, 52 Stat. at 348, 25 U.S.C. § 396a note. This fact, standing alone, also does not mean that recourse to the 1919 Act promotes disharmony.

requiring such rental payments may have been inconsistent with defendant's duties as a trustee.

7. The fact that the regulations (*see supra* section 12) provided that rental payments shall be allowed as a credit against royalties indicates that the primary source of revenue was to be the royalties. The facts that the rental rates were basically low in amount and that the regulations

placed a 960-acre limit on the area to be leased also indicate that the royalties and not the rental payments were designed as the primary source of revenue under the leases. For further support for this conclusion see the legislative debate regarding the 1919 Act. 58 Cong.Rec. 271 (1919).

It is undisputed that neither the 1938 Act nor the regulations promulgated pursuant thereto address prospecting. Therefore, that portion of the 1919 Act is not expressly inconsistent with the 1938 Act and is therefore not repealed by section 7 of the 1938 Act. However, plaintiff argues that all mining leases on its reservation lands entered into after 1938 should be governed only by the 1938 Act, citing *Blackfeet Tribe v. Montana*, 729 F.2d 1192, 1200 (9th Cir.1984), *aff'd*, —— U.S. ——, 105 S.Ct. 2399, 85 L.Ed.2d 753 (Sup.Ct.1985).

In *Blackfeet Tribe v. Montana, supra*, the State of Montana argued that the consent to taxation of certain oil and gas leases found in a 1924 Act also applied to leases entered into after the passage of the 1938 Act. Montana argued that the silence of the 1938 Act regarding state taxation of production from oil and gas leases left the taxation portion of the 1924 Act in tact and applicable in post-1938 leases. Montana argued that since no provision of the 1938 Act was inconsistent with the taxation provision of the 1924 Act, that portion of the 1924 Act was implicitly incorporated into the 1938 statutory scheme. *Id.* 729 F.2d at 1201. Montana based its implicit incorporation argument upon the fact that the Act of 1938 only repealed Acts or parts of Acts inconsistent with its provisions. The only manner in which the remainder of the 1924 Act could have been repealed was by implication. However, the general rule is that "repeals by implication are not favored, and when two statutes cover in whole or in part the same matter and are not absolutely irreconcilable, effect should be given, if possible to both of them." *United States v. Greathouse*, 166 U.S. 601, 605, 17 S.Ct. 701, 703, 41 L.Ed. 1130 (1897) and cases cited therein.

The Ninth Circuit first concluded generally that the 1938 Act superseded but did not repeal previous leasing statutes. *Blackfeet Tribe v. Montana, supra*, 729 F.2d at 1200. The effect of that holding was to leave intact the consent to state taxation found in any pre-1938 Act leases. The Ninth Circuit, however, did not accept Montana's implicit incorporation argument in the *Blackfeet Tribe* case. The court recognized the canon of statutory construction put forth by the State of Montana but found it to be merely a guidepost to discerning Congressional intent and not binding on it. *Blackfeet Tribe v. Montana, supra*, 729 F.2d at 1201 and cases cited therein. In ascertaining Congress' intent regarding state taxation of the production from oil and gas leases on Indian lands the court found no mention of taxation in the legislative history of the 1938 Act. *Id.* 729 F.2d at 1202. Montana asked that the court infer incorporation of consent to state taxation found in the 1924 Act into the 1938 Act due to Congress' silence on the matter in the 1938 Act. The Ninth Circuit, in rejecting this suggestion, stated as follows:

> The Supreme Court has instructed us, however, that congressional consent to state taxation of tribal income from on-reservation activities must be express. *See Bryan v. Itasca County*, 426 [U.S.] 373, 393, 96 S.Ct. 2102, 2113, 48 L.Ed.2d 710 (1976). We decline to hold that a canon of construction will suffice to supply the deficient express manifestation of Congress's intent to permit the tax. [*Id.* 219 F.2d at 1202] [footnote omitted].

■ Defendant's argument regarding the applicability of the prospecting without charge provision in the 1919 Act to post 1938 Act leases is similar to that asserted by the State of Montana in *Blackfeet Tribe v. Montana, supra*. As the court stated earlier, there is no provision in the 1938 Act or its regulations concerning prospecting.[8]

**8.** Plaintiff's position that defendant violated its own regulations by not requiring the payment of minimum rentals during the time when the lessee was prospecting for ore ignores the fact that neither the 1938 Act nor the regulations thereunder addressed the issue of prospecting. Plaintiff assumes that such a policy would have maximized the income return to the Tribe. The record, as discussed *infra* in the text, indicates that charging minimum rental fees immediately most probably would have discouraged many mining concerns from developing mines on the reservation, especially if the companies were

Therefore, defendant contends the prospecting part of the 1919 Act is not expressly repealed by the 1938 Act. The court, under the particular circumstances of these cases, finds utilization of the canon of statutory construction set out in *United States v. Greathouse, supra,* 166 U.S. at 605, 17 S.Ct. at 703 appropriate as one guidepost in discerning congressional intent. In *Blackfeet Tribe v. Montana, supra,* the court found that that canon alone, coupled with congressional silence regarding taxation in the 1938 Act, was insufficient, in the particular circumstances of that case, to supply the necessary "express manifestation of Congress' intent to permit the tax." *Id.* 729 F.2d at 1202 (footnote omitted). In affirming the Ninth Circuit's decision the Supreme Court emphasized the fact that taxation was involved and the "canon" that "States may tax Indians only when Congress has manifested clearly its consent to such taxation" was paramount under those circumstances. *Montana v. Blackfeet Tribe, supra,* —— U.S. at ——, 105 S.Ct. at 2403. Justice White's dissenting opinion, joined by two justices, in *Montana v. Blackfeet Tribe,* was based on the conclusion that the repealer clause in the 1938 Act only repealed acts inconsistent with the 1938 Act and found nothing in the 1938 Act that dealt with taxation of actual gas leases. Therefore, the dissent was unable to find any inconsistency between the 1938 Act and the 1924 Act on the taxation matter and thus concluded that the tax portion of the 1924 Act remained viable after passage of the 1938 Act. Since these cases do not involve the taxation of Indians, the majority holding in *Montana v. Blackfeet Tribe, supra,* as tempered by the dissent, lacks force given the facts in the cases at bar.

The court in this case finds several other "guideposts" that support giving effect to the prospecting provision of the 1919 Act in the 1938 Act leasing scheme. One such indication which supports incorporating the prospecting provision of the 1919 Act into the 1938 Act leasing scheme is the total

dearth of any provision in the 1938 Act or its regulations dealing with prospecting. As stated above, the 1938 Act referred to leases "for mining purposes". The regulations promulgated pursuant to the 1938 Act also mentions leases "for mining purposes" but fail to define the breadth or limits of that term. The severe acreage limitations set out in section 9 of the regulations would indicate that the leases (and rental payments associated therewith) were not intended to cover prospecting as well, which by practical necessity should be carried out on a larger area so that the chances of finding a more concentrated productive area are improved. In fact section 9(c) of the 1938 Act regulation refers to leases "for beds of * * * useful minerals" and limits such leases to 960 acres. Such a regulation implies that such a bed was previously located. These regulations were drafted by the Secretary of the Interior who was charged with implementing the 1938 Act. Such regulations and interpretation thereof by the Secretary are thus an important aid to the court in arriving at its construction of the 1938 Act. *See Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Thus, the Secretary's scheme of permitting unlimited acreage exploratory leases, without rental, until such time as "beds of useful minerals" were found, at which time acreage would be limited to 960 acres and rental fee requirements would apply, should be accepted unless patently unreasonable or totally unwarranted, which has not been shown to be the case in these litigations.

Another indication that the 1919 Act prospecting provision should be utilized in post-1938 leases is also found in the 1938 regulations. After reviewing the 1919 Act, it is clear to the court that the 1938 regulations were patterned primarily after the statutory provisions in the 1919 Act. Since it is uncontested that the 1919 Act required no rental payments until reserves were actually located and a claim was filed, it is not unreasonable to read the parallel 1938 regulations as requiring rental payments to

restricted to exploring and mining a maximum of 960 acres.

commence at the same point in time, *i.e.*, after an entity has prospected and located an area it wished to mine.

A final indication that prospecting without a rental charge should be continued in post-1938 Act leases is found in one of the goals of the 1938 Act as pointed out by the Supreme Court in *Montana v. Blackfeet Tribe, supra,* ——— U.S. at ——— n. 5, 105 S.Ct. at 2404 n. 5. The Supreme Court stated that one of the Act's goals was "to ensure that Indians receive 'the greatest return from their property.'" *Id.* As the court will discuss below, the record in this case indicates that charging mining companies rental fees per acre merely to prospect on large areas of land most probably would have discouraged many mining entities from acquiring mining leases on Indian lands. The record indicates, as discussed *infra*, that the primary source of income to the Indians from mining leases was to be the royalties paid based on the amount of ore mined and not the rental fees. Therefore, discouraging mining companies, which generally did not pay to prospect on non-reservation land during the relevant time period, would serve to defeat the goal of ensuring the greatest return from Indian property.

The court therefore concludes that the prospecting portion of the 1919 Act is not inconsistent with the 1938 Act and should be given effect in the post-1938 leasing scheme. *United States v. Greathouse, supra,* 166 U.S. at 605. The cases at bar, unlike the tax on Indians involved in *Montana v. Blackfeet Tribe, supra,* do not involve a situation in which an express manifestation of congressional intent to provide prospecting without a rental fee is required. Instead, the Secretary, charged with obtaining the greatest return from Indian property, adopted a method of procedure designed to accomplish that goal. The cases at bar accordingly contain persuasive indices which weigh in favor of implicitly incorporating the 1919 Act prospecting provisions into 1938 Act leases.

Plaintiff belatedly argues that at least the 1938 regulations, though not the Act, were not, in fact, silent regarding prospecting. Plaintiff points out that certain forms were specified in section 30 of the 1938 regulations. Those forms included form 5–157b for mining leases for other than oil and gas. That lease form provided in pertinent part that a particular mining entity leased a certain amount of acreage upon which it had "the exclusive right *to prospect for*, extract, mine, store and remove [a type of ore], and to occupy and use so much only of the surface of said land as may be reasonably necessary to carry on the work *of prospecting for*, extracting, mining, storing, and removing such mineral * * * "" (emphasis added). This form did not alter the rent owed by the lessee depending upon the activity being conducted by it on the land.

Under the circumstances of this case, the court does not view such a reference to prospecting as adequate to reject completely the concept of free prospecting which was allowed under the 1919 Act. A review of the leases issued which utilized form 5–157b indicates that the acreage leased was small and previously explored (*see supra* note 5). The record also indicates, however, that such a lease could not and was not intended to cover the situation in which a mining company was interested in prospecting and mining on previously unexplored land. That type of situation which the 1919 Act addressed was not dealt with in the 1938 Act or its regulations.

This problem regarding the lack of any provisions to deal with prospecting in large areas previously unexplored was recognized in an October 4, 1941 letter from the Assistant to the Commissioner, Bureau of Indian Affairs, to the Vanadium Corporation, which was interested in prospecting on a larger area of the reservation. The dilemma which faced the Assistant to the Commissioner was the probability that the Tribal Council would not meet for sometime potentially to approve a new lease form which would allow for prospecting over a greater area at no rental fee. The other problem defendant faced was the apparent interest of mining companies in en-

tering into a mining lease which did not charge them rent to prospect over large areas. In the October 4, 1941, letter the Assistant to the Commission proposed the potential use of an exploratory mining lease which the Secretary subsequently adopted.

■ It is apparent from the tenor of the October 4, 1941 letter, cited above, that defendant recognized the potential for entering into some excellent mining leases if an exploratory mining lease which did not charge a rental fee for prospecting was available. The 1938 Act and the regulations thereunder were silent on this issue, and defendant desired to receive tribal approval for a new lease form, but it recognized that it was possible that the Navajo Tribal Council would not meet for a long period of time. Therefore, defendant acted in its fiduciary capacity to promote the interests of the Tribe. Defendant, acting pursuant to section 28 of the 1938 regulations, altered the lease form utilized to permit prospecting without a rental fee. The November 13, 1941 letter, *supra,* to defendant from the Tribal Council explaining the intent of its April 9, 1941 Resolution, *supra,* anticipated the need for the Secretary to act more quickly than the Tribal Council and thus delegated to the Secretary the authority to approve leases. The court finds that defendant's action in developing the exploratory mining leases was (1) consistent with its regulatory authority (section 28 of 1938 regulations), (2) consistent with the tribal resolution, (3) consistent with the 1938 and 1919 Acts, and (4) entirely consistent with defendant's fiduciary duty of realizing the "highest possible financial return to the tribe."

Plaintiff argues that the second goal of the 1938 Act, as set out by the Supreme Court in the *Montana v. Blackfeet Tribe* case, *supra,* to assist in achieving the policy of the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479, of revitalizing tribal governments, would have been thwarted if the 1919 Act remained available for use by defendant. The 1919 Act

did not contain a provision for acquiring Indian consent to leases. *Crow Tribe of Indians v. United States,* 650 F.2d 1104, 1112 n. 11 (9th Cir.1981). Apparently, some prior leases were granted over tribal objections. *Id.* The 1938 Act, on the other hand, required tribal consent to mineral leases. Such a provision was intended to promote the involvement of the Tribes as envisioned by the Indian Reorganization Act.

The court finds plaintiff's concerns regarding the lack of consent provision in the 1919 Act an unpersuasive attempt to exclude application of any portion of the 1919 Act to post-1938 lease. The Court of Appeals in *Blackfeet Tribe v. Montana, supra,* stated that the 1938 Act superseded prior leasing statutes. Therefore, if the 1938 Act required tribal consent, and the 1919 Act did not, it would be necessary to obtain tribal consent in post-1938 Act leases. The court also notes that the Navajo Tribal Council gave general consent to the Secretary of the Interior to enter into mining leases which would achieve the highest possible return to the Tribe. In carrying out this directive the Secretary developed "exploratory mining leases" designed to attract mining entities by allowing prospecting without a rental fee, and thus ultimately produce the greatest royalties for the tribe from the ore deposits discovered by the lessee. Such an effort by the Secretary is consistent with the consent granted by the Tribal Council to the Secretary relative to entering into mining leases.

The Navajo Tribal Council's April 9, 1941 resolution consenting to mineral leases and subsequent November 13, 1941, letter expressing its interpretation of the scope of that resolution provide further support for the court's conclusion that the Secretary did not have a fiduciary obligation to collect rent from an entity which was merely allowed to prospect for ore on reservation lands. In its resolution the Tribal Council referred to leasing "proven mineral lands under Department regulations * * *."[9] In

9. Plaintiff emphasizes the language in the resolution which requires the leasing of lands "un-

the November 13, 1941, letter the tribe again referred to "proven mineral lands" and defined them as "lands which in the opinion of the Secretary's office and the Geological Survey contain minerals of potential value." As stated earlier, the record indicates that the United States Geological Survey viewed proven mineral reserves as reserves which could be blocked off on three sides and actually measured. Without initially prospecting for minerals such proven reserves could not be located and leased.

■ Plaintiff argues that the tribal council never consented to free exploration of its lands. The court agrees that the council never so consented *in haec verba*. However, a review of the April 9, 1941, resolution and November 13, 1941, letter explaining the intent of the resolution indicates that the Navajo Tribal Council wished to rely on the Secretary to the greatest extent possible to enter into leases which would "realize the highest possible return to the tribe." The tribe did not specify how this maximized return was to be achieved. As the court mentioned earlier and discusses below, the Secretary's efforts in developing the "exploratory mining leases" which charged no rental fee during prospecting were designed to achieve the Tribe's desired return. Therefore, the court concludes that the Secretary did act in a manner consistent with the Tribe's directive despite the lack of an express consent to permit prospecting large areas without charging fees therefor.

■ Finally, while there is conflict in the record on the point, the court finds that the record preponderates in favor of finding that the practice of not charging mining entities a rental fee during the period in which they were only prospecting was generally consistent with off-reservation trade practices.[10] That having been the case, defendant's actions in not charging rent for the prospecting period were consistent with its fiduciary obligations. A leading treatise on trusts states:

In determining what is reasonable rent, regard is to be had to the character of the property, the purpose of the trust,

der department regulations." Plaintiff contends that such language clearly expressed its interest in leasing lands pursuant to the regulations, which it reads as requiring immediate incremental rental payments as soon as the lease is approved. The court, however, has already stated that it finds it reasonable to read the regulations as not requiring rental payments until the prospecting has been completed and the mining entity has located an area it wishes to mine. Under such a reading of the regulations the leases were consistent with the department regulations as requested by the Tribal Council in its April 9, 1941, resolution.

10. Though the court finds that the general practice was not to charge rent to mining concerns while they merely prospected, the court notes that there are leases in evidence in which the lessees were obligated to pay rent during the period in which they were searching for ore deposits. (Exhs. CS–40 through CS–56). The Santa Fe Pacific Railroad Company entered into a series of leases in which it leased varying amounts of acreage to mining interests. The leases specifically provided that the lessees were to search for and mine a particular ore all during the lease when it was obligated to pay rent at a rate of $.25 per acre annually. The areas covered by these leases were relatively small (40 to 4627.28 acres). In those leases the right to search was in conjunction with the right to mine. Given the small areas and the fact that prospecting was part of the lease agreement, it is not unreasonable to assume that portions of the acreage under the Santa Fe Pacific Railroad Company leases may have been previously explored.

The leases at issue in this case are distinguishable. First, the clear intent of the exploratory mining leases was to separate the prospecting phase from the mining operation. Second, the leases at issue initially covered large amounts of acreage (66,560 to 107,200 acres). Third, the rental provisions in the leases made it clear that no rent was to be charged until the mining area was located and the acreage was *reduced to within the regulatory 960-acre limit*. Finally, the large reservation areas leased under the agreements at issue had not been previously explored to any great extent. Thus the onus of exploring such large, untracted areas was much greater than that ostensibly involved in the Santa Fe Pacific leases.

The court notes that the leases at issue were not sterling examples of clarity and their sloppiness blurs their intent to some degree. However, reading the leases in a reasoned manner, taking into consideration all of the surrounding circumstances, an intent to separate prospecting from mining with corresponding rental charges becomes manifested.

the local custom with reference to similar property, and all the conditions attending the execution of the lease. [G. Bogert, *supra,* at § 797] [11]

In considering these factors in the light of this record, defendant clearly acted in accordance with its duties and responsibilities as a fiduciary.

The purpose of the general trust relationship between plaintiff and defendant was and is to benefit the Indians. Specifically, the leases in this case were intended to earn the "highest possible financial return for the tribe" as stated in the Tribal Council's letter dated November 13, 1941. In acting in what the court believes was a prudent manner, defendant followed mining trade practices or local custom and chose not to charge rent during the prospecting period. The record indicates that generally mining concerns most probably would not have been interested in prospecting for minerals on the large unsurveyed reservations if they were charged rent to do so. Therefore, it is reasonable to conclude that defendant's decision not to charge rent during the prospecting period was designed to attract more potential lessees. With more mining companies involved, the potential for more royalty payments, as stated earlier the primary source of revenue from the leases, was increased and thus defendant was acting to acquire the highest possible return for the Tribe.

Based on the totality of the record, the court finds it highly improbable that a mining company would be willing to pay $.25 per acre for thousands of acres of unsurveyed land merely for the opportunity to prospect to locate an area to mine with a maximum size of 960 acres in any one state to be made available to it for mining. The record indicates that such a lease policy would have discouraged most mining concerns. On the other hand, only initially leasing 960 acres to a mining company for $.25 per acre for the first year on which that company could prospect and mine would severely limit the company's chances of finding a productive ore reserve. Also the company would be limited to that 960-acre tract in that particular state. Its rental payments most probably would be minuscule, and if it failed to find any ore reserves plaintiff would receive no royalties.

Therefore, the court concludes that the exploratory mining leases developed by the Secretary best served the interests of the Indians and promoted the purposes of the trust. Not requiring any rental payments during the prospecting period encouraged mining interests to prospect and eventually mine on the reservations. While not required to make rental payments, the prospectors were required by the leases to expend a minimum amount of money (not less than $1,000 in preliminary prospecting and not less than $7,000 total in prospecting and development) in their prospecting efforts. The record indicates that such expenditures ultimately benefitted the plaintiff. Once the prospecting interest had located the area it wished to mine (not to exceed 960 acres) the leases required it to apply to the Secretary for a lease of the limited area. The lease required the lessee to expend at least $15,000 in the first year of the lease developing the restricted mining area. Such expenditures also benefitted the reservation. Finally, the lessee was required to pay $1.00 per acre on the reduced acreage area immediately as opposed to only paying incremental rental payments starting with $.25 per acre for the first year. All of these requirements were over and above those listed in the regulations, and they clearly worked to benefit the Indians and served the purpose of the trust. [12]

11. It is also the general rule that "[t]he care required [of a trustee] is that of an ordinary man in transacting *similar business,* that is, in managing property with a view to results similar to those of the trust." G. Bogert, *The Law of Trust and Trustees,* § 541 (2d ed. 1981).

12. Defendant also required that the leases be issued to the highest bidder as requested in the Navajo Tribal Council's April 9, 1941, resolution. Such bidding was not required with non-oil and gas leases in the 1938 regulations. Such a bidding process produced bid bonuses that were additional revenues received for the bene-

The court concludes that defendant's leasing policies were substantially in accordance with its fiduciary obligations. However, the court does find that defendant had an obligation to begin collecting the rental payments set out in the respective leases as soon as the lessees began to mine, collect or ship ore which obligated them to make royalty payments. The court finds it reasonable and fair to read the language of the leases, which shows a strong interrelationship between royalty payments and rental fees, as requiring defendant as part of its fiduciary obligations to begin collecting the rental payments in the year in which the mining entity first became obligated to pay royalties. Since the language in the leases and the regulatory provisions restrict such mining operations to 960 acres, the Secretary should have immediately begun collecting up to $960 (depending on the acreage mined) in rent to be credited against royalties paid in the first year such royalties became due.[13] Though the court concludes defendant's leasing policies generally were consistent with its fiduciary obligations, it is clear

■ In order to determine how much rent defendant failed to collect it is necessary to review the individual leases at issue. The first lease the court will consider is Lease No. 5456. That lease became effective on February 23, 1942, covering 92,160 acres of unsurveyed lands of a portion of the Carrizo Mountains in Arizona. The public notice of this mineral lease sale, published on November 28, 1941, described the advertised sale as "an exploratory mining lease for carnotite and related minerals." While not crystal clear from the record, the court is persuaded by the totality of the record that potential bidders were aware of the Secretary's practice and procedure of not requiring rental payments for prospecting activities over large areas with a reduction in acreage in accord with the regulations to occur by lease modification when mining activities commenced in any area which would trigger the requirement for rental payments. In 1942, the

fit of the Indians which would not have otherwise been received.

It can be said that the Secretary added to and altered certain provisions in the 1938 regulations when he approved the leases at issue. Section 28, *supra*, of these regulations empowered the Secretary to change or alter these regulations at any time. The Navajo Council authorized leases to be subject to the regulations and thus approved the right of the Secretary reasonably and rationally to alter the terms and language of the leases so as to benefit the Tribe. Plaintiff argues that this violation (no rental fee for exploration only) of the regulations was a breach of defendant's fiduciary duty. First, the court finds that defendant's actions were not in violation of its fiduciary obligation and were actually for plaintiff's benefit. Second, in other cases involving leases in which the Secretary of the Interior approved leases contrary to the applicable regulations, at least one circuit court has ruled that the Secretary had the authority to alter or suspend the regulations. *See Hallam v. Commerce Mining & Royalty Co.,* 49 F.2d 103, 108 (10th Cir.1931). *See also Chisholm v. House,* 160 F.2d 632, 642 (10th Cir.1947). Plaintiff's attempt to distinguish these cases is unpersuasive.

Plaintiff also argues that the statutory and regulatory provisions should be construed liberally in favor of the Indians. *See Montana v.*

*Blackfeet Tribe, supra,* —— U.S. at ——, 105 S.Ct. at 2403; *J. Carilla Apache Tribe v. Andrus,* 687 F.2d 1324, 1332 (10th Cir.1982). The court agrees with this general proposition. However, the court also notes that such a general rule does not require a reading of a statutory or regulatory provision which is not supported by the record and is contrary to a reasonable reading of the specific provision given the circumstances of the case. *See Oregon Dept of Fish and Wildlife v. Klamath Indian Tribe,* —— U.S. ——, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985). *See also Montana v. Blackfeet Tribe,* —— U.S. ——, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (White, J., dissenting).

13. Since the leases and the regulations prohibited the mining concerns from mining all of the acres on which they were permitted to prospect, the court finds it reasonable to limit the initial rental obligation to at most $960 ($1.00 per acre for 960 acres) as opposed to requiring the mining companies to pay rent on the entire prospecting acreage. Though the Secretary may not have ordered the reduction of the lease to 960 acres or less in the first year, the court finds it reasonable to conclude that the mining companies were probably mining or collecting ore in the early stages of their lease from a limited area (probably within 960 acres) and thus it is fair only to assess such a limited rental fee.

lessee, Vanadium Corp., paid no rent but it did pay $632.43 in royalties. Under the court's view of defendant's fiduciary obligation, it was required to collect rent in the first year in which royalties were earned and in every year thereafter while the lease remained valid. Since the acreage was not reduced by order of the Secretary during 1942, defendant should have collected for that year a rent of $960 for the full maximum mining acreage area allowable. Crediting this rental amount owed against the royalties paid results in the amount of $327.57 owed by defendant to plaintiff under Lease No. 5456 for 1942. It should also be noted that $2,000 was paid to the Tribe as a bonus in connection with this lease.

On May 14, 1943, under Lease No. 5456 the Secretary ordered the reduction in the leased acreage to 229.14 acres for a mining area under a permanent operating lease. An advanced rental payment of $1.00 per acre was received to cover this reduced area on March 30, 1943. The court concludes that this rental payment collected by defendant was in accordance with its total fiduciary obligation owed to plaintiff and thus plaintiff is not entitled to any additional rental payments for that year.[14] Plaintiff concedes that proper rental payments were made for calendar year 1944 through 1946 under Lease No. 5456. Therefore, plaintiff is entitled to additional rental payment of $327.57 under Lease No. 5456.

The second lease at issue is Lease No. 5705 covering unsurveyed lands in Arizona and New Mexico. That lease was entered into on July 14, 1942, covering 66,560 acres. In 1942, the lessee, Vanadium Corp. paid neither rent nor royalties. Since it was not obligated to pay any royalties it can be reasonably assumed that the lessee was only prospecting and thus no rent was due.

In connection with this lease, the Tribe was paid $7,600 as a bonus.

On September 2, 1943, the total area of the leasehold was reduced to 436.79 acres for a mining area under a permanent operating lease. The order modifying the acreage provisions of the lease stated in pertinent part:

WHEREAS, it appears that the lessee has complied with the requirements of the lease as to expenditures for prospecting and development work on the leased premises and is entitled to have the acreage of the lease reduced; and

WHEREAS, the reduced acreage applied for under this lease comprises 406.-47 acres in New Mexico and 30.32 acres in Arizona, or a total of 436.79 acres more or less; which acreage together with lands held by this lessee under other leases with the Navajo Tribe (Contracts I-149-IND-5456 and 5869) is well within the acreage limitation of 960 acres in any one state under Sec. 186.9, Title 25, Code of Federal Regulation;

During that year the lessee was required to pay a royalty of about $7,666 against which its rental obligation of $436.79 should have been credited. That would have been the only rent which defendant would have been required to collect. Plaintiff concedes that the proper rental payments were collected by defendant for 1944 through 1946. The court concludes that no rental payments are due plaintiff under Lease No. 5705.[15]

The final lease at issue is Lease No. 6197 which had an effective date of October 27, 1943, covering unsurveyed lands in Arizona. That lease initially covered 107,520 acres. In 1943, the lessee, Curran Bros. and Wade, paid no rent. However, the lessee did pay $353.91 in royalties. Since the lessee paid royalties, defendant should have collected rent on the maximum mining

---

14. Under Lease No. 5456, plaintiff seeks to recover rental payments of $23,040 for 1942 (based on $.25 per acre × 92,160 acres) and $46,080 for 1943 (based on $.50 per acre × 92,160). Subtracting from these claim figures royalties paid the Tribe and/or credits, the total claim for these two years is $63,238.76.

15. Under Lease No. 5705 plaintiff seeks to recover rental payments of $16,640 for 1942 (based on $.25 per acre × 66,560 acres) and $33,250 for 1943 (based on $.50 per acre × 66,560 acres). Subtracting from these claim figures royalties paid the Tribe, the total claim for these two years is $42,272.09.

area of 960 acres which would equal a rent of $960 for 1943 ($1.00 per acre). Crediting the amount of rent defendant should have collected against the royalties paid by the lessee ($353.91) leaves $606.09 in rent which defendant had a duty to collect. In connection with the lease, the Tribe was paid a bonus of $5,085.

Effective January 27, 1944, the acreage of the leasehold was reduced to 960 acres for a mining area under a permanent operating lease and defendant collected the required $960 in advance rentals from the lessee. These rental payments were properly credited against the royalties received from the lessee for 1944. No additional rent is due for 1944 under Lease No. 6197.[16] Plaintiff concedes that it is not entitled to any additional rent for 1945 or 1946 under Lease No. 6197 since the proper rental payments were collected. Therefore, the court concludes that plaintiff is entitled to additional rental payments of $606.09 under Lease No. 6197.

Plaintiff also contends that as to lease No. 6197 defendant breached its fiduciary obligation to enforce the rental requirements as set out in the lease. *See generally United States v. Seminole Nation*, 146 Ct.Cl. 171, 173 F.Supp. 784 (1959). Section (b) of lease No. 6197 does contain the minimum annual rental fees set out in the 1938 regulations. The other two leases in issue did not contain the minimum annual rental fees set out in the 1938 regulations. The only copy of lease No. 6197 presented to the court is a very poor one with a notation next to section (b) stating "see below". That notation undoubtedly refers to the typewritten portion of the lease added to the standard boilerplate lease, which also contains a rental provision. A reasonable reading of all that is written on that page of lease No. 6197 indicates that the typewritten rental provision, and not the boilerplate was intended to control in that lease, and the court finds that defendant was in compliance with this typewritten portion of the lease.

In summary, plaintiff seeks to recover $184,176.37 under the lease rental issue. While not clear in the record, it would appear that there maybe some acreage overlap relative to the lease issue, which, if true, would justify some reduction in plaintiff's total lease claim. However, the record is such that the court is unable to state the amount of any such reduction. Plaintiff does concede there is lease overlap acreage vis-a-vis the lease rental issue and the Exploration Issue, to be discussed next, which would justify a reduction, to some degree, in the amount claimed under the Exploration Issue. The court concludes that plaintiff only is entitled to recover $933.66 on this issue. The court will address the question of interest entitlement on this amount, *infra*.

### B. *Exploration Issue*

The second issue to be addressed by the court is plaintiff's allegation of self-dealing on the part of defendant in allowing a governmental agent to explore[17] for ura-

---

16. Under Lease No. 6197, plaintiff seeks to recover rental payments of $26,526.09 for 1943 (based on $.25 per acre × 107,520 acres) and $52,139.43 for 1944 (based on $.50 per acre × 107,500 acres). Subtracting from these claim figures royalties paid the Tribe, the total claim for these two years is $78,665.52.

17. Defendant takes issue with the use of the word "exploration" and prefers to refer to the activities of the government agent at issue as a resource inventory. Defendant contends, and the record indicates, that defendant's agent merely surveyed and mapped areas and analyzed rock samples on the reservation. These activities defendant asserts do not constitute "exploration", which connotes drilling or tunneling to find mineral deposits. The court finds

that such activities were not conducted, but for convenience, the court will utilize the term "exploration" in its discussion of this issue. Use of the term "exploration" is consistent with the Department of the Interior's definition of that word as encompassing the following activities: "(1) geological surveys, (2) geophysical prospecting (may be ground, aerial or both), (3) boreholes and trial pits, or (4) surface or underground headings, drifts or tunnels." Department of the Interior, *A Dictionary of Mining, Mineral and Related Terms*, 410 (1968).

The court notes that Congress, in the Act of August 1, 1946, 60 Stat. 755, Section 5(b)(6), which dealt with the development and control of atomic energy, recognized the distinction between "exploration" and "investigations and in-

nium on plaintiff's reservation without compensating the tribe for such use of its land. Plaintiff contends that the exploration for uranium conducted on its lands was for defendant's benefit (national defense) and thus violated defendant's duty of loyalty and its obligation to avoid self-dealing.[18] Alternatively, plaintiff asserts that defendant's failure to compensate the tribe for the government's exploratory use of its lands constitutes a taking in violation of the Fifth Amendment. Defendant contests that its actions were in any way violative of its special fiduciary obligations to the Indians or that its actions constituted a "taking" entitling plaintiff to just compensation.

In 1942, defendant established the Manhattan Engineering District (MED) to develop a nuclear weapon for the war effort. In cooperation with MED, the Union Carbide Corp. created a subsidiary, Union Mines Development Corp. (UMDC) which was organized to conduct a search for ura-

nium. The contract between MED and UMDC was a cost-reimbursable no fee or profit agreement.

The principal domestic source of supply of uranium is found in the carnotite ores [19] on the Colorado Plateau in the states of Arizona, Colorado, New Mexico and Utah. The Navajo Indian Reservation was at least partially in that region. In the fall of 1943, UMDC set up field headquarters in Grand Junction, Colorado. It recruited geologists and engineers who were sent out in small parties to conduct field surveys of the Colorado Plateau. This area covered reservation land and non-reservation land as well as government land (state, local, federal) and non-government land. Landowners were not informed that the purpose of this survey or exploration was to locate uranium for national defense purposes since the matter of the weaponry involved was top secret. UMDC did not obtain prospecting permits, mining leases

---

spections to determine the location, extent, mode of occurrence, use, or conditions of deposits or supplies of source materials * * *." Though the court does not find such a distinction crucial in this case, it does note that the distinction was important in the 1946 Act. Section 5(b)(6) of the 1946 Act provided that mining interests conducting exploratory operations were required to acquire consent of the landowner, but companies conducting investigations or inspections were not required to acquire the landowner's permission to do so. The court also notes that the payment of just compensation was required for any *damages* caused by either exploration or investigations and inspections.

18. Plaintiff argues that defendant is liable for its self-dealing. In determining the damages which plaintiff is entitled to as a result of such self-dealing, plaintiff admits that generally the measure of damages is the profits received by the trustee, citing *Restatement 2d, Trusts,* §§ 205–206. Plaintiff concedes in this case that it is impossible to measure the profit or benefit which accrued to defendant from the exploration activities on the reservation. Therefore, as an alternative, plaintiff argues that it is entitled to the minimum annual rental payments set out in the regulations, discussed, *supra,* under the Lease Rental Issue, for the use of its lands. Though there is a conflict in the record over the acreage investigated by defendant's agent (*see infra* note 21), plaintiff asserts it is entitled to rental payments for 3,328,000 acres for 4 years

(1943 through 1946) at the incremental rental rates set out in the regulations. Plaintiff claims it is entitled to $7,488,000 as rental payments for the years 1943, 1944, 1945 and 1946, due to defendant's alleged self-dealing. With the interest claimed by plaintiff on this $7,488,000 figure, its total claim amounts to $18,853,784.00.

19. Carnotite ores on the Navajo Reservation contained radium, vanadium, and uranium as co-products. Radium is a radioactive element. At all times material to this case, the primary use of radium was in luminescent paint. Radium was the principle mineral sought from the carnotite ore on the Reservation until shortly before World War II. Vanadium is an element used in the manufacture of steel as the hardening agent. It was a strategic mineral during World War II and its production was encouraged by defendant to further the war effort. Indeed, defendant owned and operated Metals Reserve Company as a purchasing agent to secure vanadium. Uranium is a fissionable, radioactive element. Prior to 1942, there was a small worldwide market for uranium for use as a ceramic glaze. Subsequent to 1942, uranium was acquired for weaponry purposes by defendant. In this endeavor, uranium activities on the part of the defendant were, in these early stages, clothed with secrecy. Later, the production of uranium ore was encouraged in the hope of developing a new industry. *See e.g.,* the Act of August 1, 1946, 60 Stat. 755, for the development and control of atomic energy.

or any grant of authority from any of the land owners in the Colorado Plateau area relative to their exploration efforts. A June 1951 United States Atomic Energy Commission Staff Report described the purpose of the UMDC field survey or exploration as follows:

> The principal purpose of the Union Mines project was "to reconnoiter the Colorado Plateau region, with sufficient study of its general geology, stratigraphy, and structure; and, to assess the distribution, magnitude, and tenor of its ore deposits as was considered necessary to completely evaluate the ultimate potential uranium resources of the region."

UMDC geologically mapped the region, measured stratographic areas, sampled and analyzed minerals, and computed potential ore reserves for possible extraction. At no time, did UMDC intend to mine in the survey areas or acquire any type of interest in the land. UMDC performed no drilling or tunneling, and its activities did not in any way interfere with any prospectors, lessees or owners of the surveyed land. In fact, the only thing produced by UMDC's activities was a set of detailed reports regarding potential ore deposits in the region. In early August 1945, after the explosion of the first atomic bomb in Japan, the last of the UMDC survey party departed the Navajo Reservation.

During 1945 and 1946 the results of the Colorado Plateau region survey were compiled into written reports at Grand Junction, Colorado. These reports contained detailed data regarding potential ore deposits and expected reserves. These reports were classified as secret and presumably remained so classified until 1957 when they became available for tribal use.

The survey information obtained through exploration by UMDC was subsequently utilized in mining operations in the Colorado Plateau area for uranium. However, "[t]here was no concentrated effort toward the exploitation of the uranium content in the carnotite ore until the advent of the Atomic Energy Commission in 1947." *Union Carbide v. Nisley*, 300 F.2d 561, 581–82

(10th Cir.1961), *cert. dismissed, Wade v. Union Carbide and Carbon Corp.*, 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). During the period 1937–1946 there was no viable commercial market for uranium. Indeed, until 1968, all uranium produced in the United States was required to be sold to the United States government. Under the 1946 Act, *supra*, UMDC's exploration activities relative to uranium came under the umbrella of the Atomic Energy Commission (AEC) which, after 1946, controlled and regulated all phases of the uranium industry. The AEC, after it was established, took over all functions of the MED. Until 1968 all uranium produced in the United States was required to be sold to the Federal Government, *i.e.*, the AEC was the only legal purchaser of uranium produced in this country. *See Union Carbide v. Nisley, supra*, 300 F.2d at 582. The AEC encouraged exploration or investigation for uranium and set the price at which the government would purchase uranium. When and where necessary the AEC added bonuses to further discovery of uranium and its production.

Subsequent to 1946, the AEC went back to the Navajo Reservation and completed the unfinished exploration work of UMDC. It also carried through with a drilling exploration program. The Tribe benefited from the drilling data furnished it, at no cost, by the AEC. The Tribe was informed of the AEC drilling program. The record indicates that mining activity on the Navajo Reservation resumed and the Tribe became more interested in mining on the reservation in 1948. By resolution dated October 1, 1949, the Tribe expressed its desire for greater development of uranium and vanadium mining and a desire to encourage the individual Navajo's initiative in mining whenever possible. This resolution authorized exploration of reservation lands by any government agency provided that any information obtained be made available to the Tribe at no cost to the Tribe. It is to be noted that this resolution did not require any rental fee for allowing exploration for minerals on reservation lands. Further,

the resolution provided that any land areas on the reservation selected by the AEC and the Bureau of Geological Survey for exploration or development shall be withdrawn from further prospecting. By resolution dated March 22, 1951, the Navajo Tribal Council authorized various alterations and changes in regulations pertaining to mining on the reservation.

Defendant admits that UMDC survey teams studied portions of the Navajo Indian Reservation.[20] Again, these survey crews mapped the reservation lands and ascertained the location of potential ore deposits. UMDC obtained no prospecting permit, lease, or other grant of authority to conduct its investigations on the reservation or anywhere else on the Colorado Plateau.[21] Occasionally, a reservation Indian would question the right of a survey team to be on the reservation presumably in the spirit of being leery of strangers, but in the remote areas of the reservation the Indians were not really concerned about the survey team being there.

■ Plaintiff contends that defendant's actions in allowing such exploration of the reservation constituted self-dealing and a breach of its duty of loyalty. It is true that this exploration activity benefitted the Manhattan Project and defendant's national defense efforts to some extent. In that case it is at least arguable that if defendant were in a private fiduciary position it could be held liable for a breach of its duty of loyalty. *See* G. Bogert, *supra*, at § 543; Scott, *The Law of Trusts*, § 170 *et. seq.* (1967). A private trustee can be held liable

for such a breach even if the beneficiary was not financially damaged. *See* G. Bogert, *supra*, at § 543.

■ However, the trust relationship between the Federal government and the Indians is unique and distinctive. *See Seminole Nation v. United States*, 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480, 1777 (1942). In discussing the application of law governing private trustees and the rules governing a breach of duty by the fiduciary to the beneficiary in the context of the relationship between the Federal government and the Indians the Supreme Court stated: "While these undoubtedly provide useful analogies in a case such as this, they cannot be regarded as finally dispositive of the issues." *Nevada v. United States*, 463 U.S. 110, 127, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983).

In *Nevada v. United States, supra,* the Federal government was forced to represent in prior litigation, both an Indian Reservation and a congressionally mandated arid lands reclamation project. Congress mandated that irrigable lands of the Indian Reservation be included in the reclamation project. The Supreme Court viewed the Secretary of the Interior's duties toward the Indians and under the reclamation project as "requiring the Secretary of the Interior to carry water on at least two shoulders when it delegated to him both the responsibility for the supervision of Indian Tribes and the commencement of reclamation projects on areas adjacent to reservation lands." *Id.* 463 U.S. at 128, 103 S.Ct. at 1917. However, the Court

---

**20.** The survey undertaking was unrestricted in scope covering the entire Colorado Plateau area. This vast area included portions of the reservation. There is a conflict in the record regarding the actual acreage of the area studied by UMDC on the Navajo Indian Reservation. Plaintiff's expert estimated 3,328,000 acres and defendant's expert estimated 192,000 acres. Resolution of this sharp conflict is impossible on this record. In light of the court's conclusion of no liability on defendant's part on this issue, the court's inability to resolve the conflict at this time is of no moment. There was testimony in the record by defendant's experts that leasing of such a vast area as estimated by plaintiff was an unreasonable expectation, especially in view of

the 960 acres per state lease limitation set out in the mining regulations as discussed previously. It is, on this record, economically unrealistic to assume, as plaintiff does, that all 3,328,000 acres could have and should have been leased at the regulatory rental rates for prospecting for uranium during 1943–1946.

**21.** As stated earlier, the record indicates that it was not the custom in the mining industry to require anyone to pay for the right to prospect for potential ore deposits although, it would seem, it was done on occasion. *See* note 9, *supra.*

found that since Congress created this situation it was "unrealistic to suggest that the government may not perform its obligation to represent Indian tribes in litigation when Congress obliged it to represent other interests as well." *Id.* 463 U.S. at 128, 103 S.Ct. at 1917.

In implicitly recognizing that such a representation would probably violate the duty of loyalty of a private trustee the court stated:

> * * * In this regard, the Government cannot follow the fastidious standards of a private fiduciary, who would breach his duties to his single beneficiary solely by representing potentially conflicting interests without the beneficiary's consent. The Government does not "compromise" its obligation to one interest that Congress obliges it to represent by the mere fact that it simultaneously performs another task for another interest that Congress has obligated it by statute to do. [*Id.* 463 U.S. at 128, 103 S.Ct. at 1917.]

The court finds this reasoning directly applicable in dealing with the exploration issue. Defendant was presented with its fiduciary obligations to the Indians and its obligation to promote the interests of national defense. It may be that defendant's actions in this case would be a breach of a private fiduciary obligation in that it acted in part to benefit itself, but in the specific context of defendant's obligations to plaintiff the "fastidious standards of a private fiduciary" are not controlling.

In addition to its reliance on theories of private trust law, plaintiff cites two Court of Claims cases in support of its claim that defendant breached its duty of loyalty toward the Indians. These cases are *Navajo Tribe of Indians v. United States*, 222 Ct.Cl. 158, 610 F.2d 766 (1979) and *Navajo Tribe of Indians v. United States*, 176 Ct.Cl. 502, 364 F.2d 320 (1966). In the earlier of these two cases (176 Ct.Cl. 502), Continental Oil Company held a lease of 3,720 acres on the Navajo Reservation. Helium was included in the terms of the lease. Continental drilled a well which produced helium. Continental had no interest

in producing helium so it informed the Bureau of Mines of its intent to surrender its lease to the Tribe. The Bureau of Mines was interested in the helium based on the government's wartime need. Fearing delays in acquiring the lease from the Indians if Continental surrendered it to them, the Bureau of Mines acquired an assignment of the lease from Continental for nominal consideration without informing the Indians of (1) Continental's desire to surrender the lease or (2) of the assignment of the lease until after it was effective. *Id.* 176 Ct.Cl. at 508–09, 364 F.2d at 323–24. The Indians subsequently sued the government claiming that the assignment should have been acquired for the benefit of the Tribe.

First, regarding these facts, the Court of Claims found a conflict of interest within the Department of the Interior. *Id.* 176 Ct.Cl. at 507, 364 F.2d at 323. The Department had the obligation to safeguard the property of the Navajos when they were dealing with third parties. The party with an interest adverse to those of the Tribe was the Bureau of Mines, an agency within the Department of the Interior. The court found that the Department's fiduciary obligation toward the Indians and the conflict of interest present warranted careful scrutiny of the situation. *Id.* 176 Ct.Cl. at 507–08, 364 F.2d at 323.

In scrutinizing the conflict of interest regarding the helium well, the court stated: Although the actions of the Bureau [of Mines] personnel may have been in the national interest, they were not consistent with the Government's duty to the Navajos." *Id.* 176 Ct.Cl. at 509, 364 F.2d at 323–24. (Citation omitted.) The court went on to state:

> The tribe should have been informed of Continental's desire to surrender the lease. The case is somewhat analogous to that of a fiduciary who learns of an opportunity, prevents the beneficiary from getting it, and seizes it for himself. Under such circumstances, the beneficiary (here the tribe) is entitled to recover. [Citation omitted] [176 Ct.Cl. at 509, 364 F.2d at 324.]

The court subsequently awarded the plaintiff damages for defendant's breach of its fiduciary obligations.

In the later Court of Claims case relied on by plaintiff (222 Ct.Cl. 158, 610 F.2d 766), the tribe alleged that the government was leasing land in its Bureau of Land Management Lands adjacent to the Navajo reservation for oil and gas purposes but it was not leasing tribal land for the same purpose. The plaintiff asserted that the government was leasing its own land at the expense of the Indians. The court stated in pertinent part:

> If this assertion can be proved, there would be a violation of the defendant's fiduciary obligation. As fiduciary to Indians, the Government cannot prefer its own monetary interests where there is a conflict-of-interest situation; for example, it cannot, after learning of an opportunity, prevent the beneficiary from getting it and seize it for itself. (Citation omitted) [Id. 222 Ct.Cl. at 164, 610 F.2d at 768–69.]

The court thus dismissed the defendant's motion to dismiss the plaintiff's conflict-of-interest claim.

In the case at bar the facts are distinguishable. The action of defendant, complained about by plaintiff, was its failure to charge rent to a government agency (UMDC) surveying for minerals on reservation lands. This action plaintiff contends was for defendant's benefit and constituted defendant resolving a conflict-of-interest in defendant's favor. In the two *Navajo Tribe of Indians* cases, *supra*, relied on by plaintiff, the government acted or may have acted by seizing an opportunity for its own benefit and preventing the Indians (the beneficiaries of the trust arrangement) from acquiring the opportunity for their own benefit. In this case defendant could not and did not act in that manner.

First, all that defendant allowed UMDC to do was to enter the reservation and survey for ore deposits without charging it any rental fee. The court has already found that it was entirely reasonable, *i.e.*, consistent with the trade practices and the rule of reason, not to charge rental fees to mining concerns who were merely prospecting.[22] It would have been highly unlikely for plaintiff to find a mining company willing to pay rent merely to perform the same tasks which were done by UMDC. Therefore, defendant did not seize an opportunity from plaintiff.

Second, though the exploration performed by UMDC was designed to benefit interests of national defense, it equally promoted the purposes of the trust arrangement between plaintiff and defendant regarding the leasing of lands for mining purposes. In 1936 or 1937, the Tribal Council passed a resolution requesting the Secretary of the Interior to investigate the extent and value of the carnotite deposits on the reservation. Though UMDC's survey may not have been specifically done pursuant to that request, it certainly advanced those interests of plaintiff.

Third, on April 9, 1941, the Tribal Council passed a resolution which stated: "The Navajo Tribe wants its mineral resources developed in a proper way to provide income to the Tribe. *Furthermore, many of those minerals are needed at the present time for National Defense purposes.*" (emphasis added.) In explaining the scope of that resolution the Tribal Council stated in its November 13, 1941, letter:

> It was the intent of the Tribal Council to delegate to the Secretary of the Interior authority to approve mining leases as he was in a much better position than they to make more profitable lease arrangements. Because the Council met but twice a year such methods would

---

22. This is also a basis for rejecting plaintiff's measure of damages based on the regulatory rental rates. *See supra* note 17. Plaintiff asserts that it is entitled to $7,488,000 in rental payments for the use of its land by UMDC. Given the trade practice at the time of generally not charging rent for prospecting along with the fact that there was a very limited market for uranium and the other co-products of carnotite ores, it seems very unlikely that plaintiff could have found any mining concern at that time willing to pay that amount of rent simply to survey the reservation for ore deposits.

also be quicker. *In the interests of national defense as stated in the Council resolution, this would appear to be very important at this time because of the great demand for critical minerals such as vanadium and copper.* [emphasis added.] [23]

The November 13, 1941, letter went on to express the Council's interest in the Secretary of the Interior's realizing "the highest possible financial return to the tribe * *." Defendant's actions in allowing UMDC to explore the reservation were consistent with the desires of plaintiff. The exploration clearly aided in developing the use of mineral resources on the reservation. The location of the ore deposits was the necessary first step toward the commencement of mining which would produce royalties for the Tribe. Plaintiff was interested in the accrual of such royalties which would provide it with its primary source of financial return. Finally, the Tribe specifically recognized, at least implicitly, the needs of the national defense effort and acknowledged that the servicing of national defense interests could serve plaintiff's interests as well.

Therefore, when all these factors are considered, it is clear that defendant's actions, relating to UMDC's exploration of the reservation, were consistent with defendant's fiduciary obligations to the Tribe. UMDC's exploration served to benefit plaintiff as well as defendant. The conflict-of-interest which existed in the two cases relied on by plaintiff did not exist in this case. Defendant did not learn of an opportunity and snatch it away from plaintiff. If anything, defendant acted to develop an opportunity for the benefit of plaintiff as well as itself. The court does not view such activities under the existing circumstances as actionable self-dealing and thus finds no liability based on that theory.[24] Further, the overall interests of Indians were clearly served by the UMDC search which produced subsequent income (royalties). There was no actionable conflict here.

Plaintiff also asserts that defendant's failure to pay plaintiff for the use of its lands for exploration purposes constitutes a taking of 3,328,000 acres of tribal lands under the fifth amendment which warrants the payment to it of just compensation. The court concludes that no taking occurred in this case.

**23.** Plaintiff stresses the fact that the Tribe was not informed of the purpose of the survey or given immediate access to the survey's results. However the Tribe was generally aware of the national defense effort and manifested its desire to cooperate in this effort in its November 13, 1941, letter. It is not unreasonable to believe that during the period of the late 1940's and 1950's, the Tribe would have abided by the secrecy requirements necessary if given the option of disclosing and using the survey data and would have authorized the survey and surrounding secrecy if asked to do so. As to the secrecy requirement relative to the Manhattan Project (MED) see *Union Carbide and Carbon Corporation v. Nisley,* 300 F.2d 561, 581–83 (10th Cir.1962).

**24.** Plaintiff cites one specific example of self-dealing which really is immaterial to the exploration issue. Under the regulations, section 26, the Secretary was authorized to assign leases. A vanadium lease (No. 6197) was operated by the Currin Brothers and Thomas Wade until defendant stopped buying vanadium in February 1944, at which time the lessees stopped operating the lease since the lease then became un-

profitable. There was a surplus of vanadium in 1944. *See Union Carbide v. Nisley, supra,* 300 F.2d at 584. Currin Brothers assigned the lease to UMDC on April 17, 1944. UMDC thereafter paid the annual rentals on 960 acres under lease No. 6197 until 1949 when UMDC assigned the lease to the Atomic Energy Commission. The record suggests that since the ore in the area of this lease would not justify mining efforts at the prices then being paid, no mining activities were conducted during this time period (Tr. 1079). Production under this lease did not begin again until later in the 1950's. These events are not related to the exploration issue on which plaintiff seeks damages. Plaintiff states only that there is no evidence in the record that the Tribe knew about these assignments or approved them or that any effort was made to cancel the lease in 1944, instead of assigning it, for resale to buyers who knew of defendant's need for uranium. Plaintiff does not deny it received rentals under the lease for the period subsequent to 1944. From these facts plaintiff wants the court to draw an inferential self-dealing condemnation of defendant sufficient to help support a $7.4 million award. The court refuses to do so on this record.

■ The Court of Claims has stated: "Before a taking can be established, it must be clear that there was an intent by defendant to take private property. Such an intent can be implied from the facts." *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978). The record in this case indicates that there was no intent to take plaintiff's land. UMDC merely entered plaintiff's reservation to explore for mineral deposits. It neither intended to nor did it disturb the lands, oust the Tribe from their lands or interfere with any existing lease agreements. UMDC also had no intent actually to mine any ore at the completion of its mineral survey. Clearly, given these facts, there was no intent to take plaintiff's land.

Second, a taking requires an assertion of dominion over the property by defendant. Such an assertion can take the form of ousting the Indians from their lands, taking possession of the lands or asserting dominion consistent with the actions of an individual dealing with his own land. *See Pillager Bands of Chippewa Indians v. United States*, 192 Ct.Cl. 698, 704, 428 F.2d 1274, 1277 (1970); *Three Affiliated Tribes of Fort Berthold Reservation v. United States*, 182 Ct.Cl. 543, 557, 564, 390 F.2d 686, 693–94, 698 (1968). There was no exercise of any such dominion in these cases and thus there was no taking.

Plaintiff argues, however, that the taking involved in this case was not the taking of the land itself, and plaintiff's entire interest therein, but rather was a taking of a leasehold interest in the land. *See United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (interest in land taken may be less than fee simple interest); *Foster v. United States*, 221 Ct.Cl. 412, 423–24, 607 F.2d 943, 949

(1979). Plaintiff contends that a taking of a leasehold interest in its land occurred due to defendant's failure to collect a rental fee from UMDC while it was exploring the reservation lands. The court finds this argument, as advanced by plaintiff, to be unpersuasive.

■ The "interest" plaintiff actually is asserting defendant took from it was the potential right to receive income from its land, if such land had been leased for exploratory purposes. Such an "interest" is not a leasehold interest. A leasehold is the interest held by a lessee for a given period of time. Plaintiff was not a lessee of its reservation land and thus had no leasehold interest to be taken. If anything, defendant's failure to collect rental fees from UMDC was a breach of a fiduciary obligation, which the court has already stated did not occur in these cases. Even assuming *arguendo* that the alleged right to receive rental payments is a property interest which may be taken, all that plaintiff would be entitled to is the value of the property "taken". *United States v. General Motors Corp., supra*, 323 U.S. at 379, 65 S.Ct. at 360. The court has already stated that the record indicates that it was highly unlikely that any mining company would be willing to pay rent merely to perform a mineral survey on plaintiff's land. Therefore, defendant's failure to collect rent in this case neither deprived plaintiff of any "interest" in its property (*compare Foster v. United States, supra*, 221 Ct.Cl. at 424, 607 F.2d at 950), nor did it interfere with plaintiff's right to attempt to rent its property for exploration purposes. Accordingly, the court concludes that defendant's failure to collect rent for plaintiff's benefit from UMDC does not constitute a fifth amendment taking.[25]

---

**25.** Another factor that weighs against finding a taking which would warrant just compensation is that defendant's actions in this case benefitted plaintiff's land by making it more valuable than it was prior to UMDC's entering the property to survey for minerals. *See, e.g., United States v. Miller*, 317 U.S. 369, 376, 63 S.Ct. 276, 281, 87 L.Ed.2d 336 (1943); *Bauman v. Ross*, 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897). The following observation by a federal court

some years ago is appropriate for consideration here:

In considering the case the true question is whether the property was injured by the improvement. If not, then there is no damage, and can be no recovery. If there is, then the recovery must be measured by the extent of the loss. If the property is worth as much after the improvement as it was before, then

Therefore, the court concludes, on the exploration issue, that plaintiff is not entitled to recover either on the basis of self-dealing or on its assertion that a taking occurred.

### C. *Abandoned Mines Issue*

The third issue presented in these cases is whether defendant breached its fiduciary duty in failing to require the filling in or sealing up of certain mines opened under mining leases on plaintiff's reservation between 1939 and 1946 and thereafter. Plaintiff has labeled this claim the "Abandoned Mines" issue. Though the record does not indicate that any damages or injuries occurred as a result of the failure to close up the mines, plaintiff contends that defendant's knowledge of the potential hazards created by the mines obligated it to ensure that proper safety precautions were undertaken.[26] Defendant on the other hand asserts that this court has no jurisdiction over this claim, and even if the court finds that it has jurisdiction, defendant maintains that it had no such duty in the 1940's to close up the mines, and therefore, it breached no fiduciary obligation.

Though it is not entirely clear from the record, it appears that 29 mines were opened on plaintiff's reservation pursuant to mineral leases prior to 1946. Plaintiff contends that all of these mines were abandoned and should have been sealed up. There were approximately 270 mines opened up after 1946 which plaintiff contends defendant has a duty to seal up as well. The record is unclear just how many of these 270 mines were covered by original pre-1946 leases, although it seems clear that some of them were dug or opened after 1946 under original pre-1946 leases. In order to establish this court's jurisdiction over plaintiff's claim that defendant has a duty to close up these 270 mines, plaintiff must be asserting implicitly that defendant had a continuing duty (and thus a continuing wrong existed) to close up these 270 post-1946 mines.

Defendant argues that plaintiff has failed to prove that any of the 29 mines opened prior to 1946 were actually abandoned prior to August 13, 1946. If the mines were not abandoned, then even under plaintiff's theory defendant would have had no obligation to close up the mines. If defendant had no such obligation prior to August 13, 1946, then, defendant argues, plaintiff's cause of action did not accrue until after that date because all of the elements of the cause of action had not "coalesced." *See Hartford Life Ins. Co. v. Title Guarantee Co.*, 520 F.2d 1170, 1173 (D.C.Cir.1975). If the claim arose subsequent to August 13, 1946, it is beyond the jurisdiction of the Indian Claims Commission Act (*see Navajo Tribe of Indians v. United States, supra,* 222 Ct.Cl. at 166–67, 610 F.2d at 770) and outside the jurisdiction of this court.

■ Though the record is less than clear on when, in fact, the 29 mines opened prior to August 13, 1946 were abandoned, the court finds that plaintiff failed to meet its burden of proving which, if any, of those 29 mines were in fact abandoned prior to August 13, 1946. The court's reading of the record, contrary to plaintiff's,

there is no damage done to the property. If the benefits received from making the improvement are equal to or greater than the loss, then the property is not damaged. There can be no damage to the property without a pecuniary loss. If there is no depreciation in value there is no damage, and if no injury, then there should be no recovery. [*Lehigh Valley Coal Co. v. Chicago,* 26 F. 415, 416 (C.C.N.D.Ill.1886).]

Looking at the value of the reservation land explored by UMDC before and after the exploration, it is clear that the land value was enhanced both as far as plaintiff and defendant were concerned. The far reaching benefits of the exploration, *i.e.,* location and mining of uranium and other minerals, which produced royalties for plaintiff, clearly benefited plaintiff far more than defendant's use of the land damaged it, and thus just compensation is not warranted in any event. *See United States v. Sponenbarger,* 308 U.S. 256, 266–67, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939).

26. Plaintiff apparently requests $6,721,000 in damages under this claim. This figure represents the present estimated cost of the remedial work required to close up approximately 299 mines remaining open at this time.

provides no persuasive evidence that any of the mines opened prior to 1946 were abandoned prior to the critical cutoff date of August 13, 1946. The court finds that many, if not all, of the 29 mines opened prior to August 13, 1946 were worked subsequent to that date, clearly indicating that they had not yet been abandoned. *See, e.g.,* Tr. 1237. Since plaintiff failed to prove that the 29 mines were actually abandoned prior to August 13, 1946, its claim regarding defendant's obligation to close up abandoned mines did not accrue until after that critical date and thus the claim is outside the jurisdiction of this court.

The court surmises that plaintiff, at least implicitly, is arguing that the fact that the mines were dug under mining leases approved prior to August 13, 1946 gave rise to a continuing obligation on the part of defendant to close up the mines whenever they were abandoned. Under plaintiff's view, either the fact that the mines were dug prior to August 13, 1946, or the fact that the mines were started under leases executed before that same date created this continuing obligation. The existence of such a continuing obligation, plaintiff implicitly asserts, gives this court jurisdiction over plaintiff's claim that defendant breached its obligation to close up the 299 mines whenever they were dug or abandoned. With such a view of this court's jurisdiction under a continuing wrong theory the court cannot agree. Moreover, leases were made and additional mines were opened after 1946. Clearly these leases and mines generated wrongs, if they be judged such, over which the court has no jurisdiction.

In 1978, the Court of Claims surfaced the continuing wrong or continuing claim basis for this court's jurisdiction in Indian cases over events which occurred after August 13, 1946 in *Navajo Tribe v. United States,* 218 Ct.Cl. 11, 586 F.2d 192 (1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979). In that case the Navajo Tribe filed a claim for a complete accounting by the government of all tribal property held in trust by the government and all expenditures from tribal property.

After receiving the accounting report, the plaintiff filed a claim in the Court of Claims alleging that the government had occasionally, both before and after August 13, 1946, wrongfully used tribal funds to pay for expenses which plaintiff alleged should not have been charged to the Indians. *Id.* 218 Ct.Cl. at 15, 586 F.2d at 195. The defendant moved to dismiss, on jurisdictional grounds, a portion of plaintiff's claim to the extent that it included allegations of improper disbursements from the tribal fund after August 13, 1946.

In denying defendant's motion to dismiss, the court addressed section 2 of the Indian Claims Commission Act of 1946, ch. 959, 60 Stat. 1050 (ratified at 25 U.S.C. § 70a (1976)) which states: "No claim accruing after the date of the approval of this Act [August 13, 1946] shall be considered by the Commission." *Id.* 218 Ct.Cl. at 17, 586 F.2d at 196. The court found that this section did not cut off the plaintiff's claims in that case. The court set out the rule that "if a wrongful course of governmental conduct began before August 13, 1946 and continued thereafter, the Commission could properly take account of and award relief for the damages or injuries suffered after that date from the continuing course of conduct which began prior that time." *Id.* 218 Ct.Cl. at 20, 586 F.2d at 198 (construing *Gila River Pima-Maricopa Indian Community v. United States,* 135 Ct.Cl. 180, 140 F.Supp. 776 (1956)).

■ Accepting this position regarding this court's jurisdiction over claims concerning government actions occurring after August 13, 1946, the court does not find that this rule grants this court jurisdiction in the present circumstances. The court in *Navajo Tribe v. United States* (218 Ct.Cl. 11, 586 F.2d 192) clearly emphasized that the continuous course of wrongful conduct had to begin before August 13, 1946. 218 Ct.Cl. at 20, 586 F.2d at 198. *See also Navajo Tribe of Indians v. United States, supra,* 222 Ct.Cl. at 166, 610 F.2d at 769. In this case, the alleged wrongful conduct was the failure to close up abandoned

mines. As stated earlier, plaintiff failed to prove that any of the 29 mines dug prior to August 13, 1946 were actually abandoned before such date. If they were not abandoned, defendant had no duty, even under plaintiff's theory, to close up the mines and thus plaintiff's claim did not accrue prior to the critical date. *See id.* 218 Ct.Cl. at 22, 586 F.2d at 199. There was no wrongful conduct prior to August 13, 1946 and thus under even the broadest reading of section 2 of the Indian Claims Commission Act of 1946, *supra,* *i.e.*, that reading found in the *Navajo Tribe* case (218 Ct.Cl. 11, 586 F.2d 192), there was no continuing wrong which would bring these claims within this court's jurisdiction.

Plaintiff is apparently attempting to take the rule of *Navajo Tribe v. United States* (218 Ct.Cl. 11, 586 F.2d 192) one step further than even the Court of Claims went in that case. Plaintiff apparently argues that once defendant executed the leases or dug the mines it was under a continuing duty to close up abandoned mines whenever the abandonment occurred. This position ignores the ruling in the *Navajo Tribe* case (218 Ct.Cl. 11, 586 F.2d 192) which requires a continuous course of wrongful conduct that commenced prior to August 13, 1946. Even assuming that the leases or the technical knowledge at the time did obligate defendant to ensure that the mines were closed up, a wrong would not have been committed until a mine was abandoned and defendant then failed to meet its obligation. *See Minnesota Chippewa Tribe v. United States*, 229 Ct.Cl. 666 (1981) (burden on plaintiff to show continuing wrong). Even the perception of a continuing wrong in *Navajo Tribe v. United States, supra,* (218 Ct.Cl. 11, 586 F.2d 192) has limits and plaintiff's implicit attempts to stretch it beyond

reasonable borders lacks support in this record.[27]

 Assuming, *arguendo,* that plaintiff had proven by a preponderance of the evidence that some of the 29 mines dug prior to August 13, 1946 had been abandoned by that date, the court does not find that defendant breached a fiduciary duty in failing to ensure that they were closed up. Generally, a trustee is "required to manifest the care, skill, prudence, and diligence of an ordinary prudent man engaged in similar business affairs and with objectives similar to those of the trust in question." G. Bogert, *supra,* § 541. "It would be both unreasonable and inexpedient to make a trustee responsible for not being more prudent than ordinary men of business are." *Id.* In determining the standard of due care it is necessary to view the circumstances of time and place within which the trustee is operating. *Id.* Thus the standard of care will vary over time and place. It is within the context of these general rules regarding defendant's required standard of care that the court reviews defendant's failure to close up the assumed abandoned mines.

The first source of any duty relating to mining procedures are generally found in the regulations and the leases. Section 3(c) of Lease No. 6197, for example, regarding the condition the mines were to be left in, stated in pertinent part:

* * * promptly to surrender and return the premises upon the termination of this lease to whomsoever shall be lawfully entitled thereto, in as good condition as received, excepting for the ordinary wear and tear and unavoidable accidents in their proper use; not to remove therefrom any buildings or permanent im-

---

**27.** Judge Nichols concurred and dissented in *Navajo Tribe v. United States,* 218 Ct.Cl. 11, 33–40, 586 F.2d 192, 206–09 (1978). Judge Nichols expressed his concern that the "continuing wrong" basis of jurisdiction would confer upon this court jurisdiction to hear many claims arising from instances well after August 13, 1946 which are sufficiently similar to a pre-August 13, 1946 adjudicated wrongful act that they are considered part of a wrongful course of con-

duct. *Id.* 218 Ct.Cl. at 33–34, 586 F.2d at 206. Judge Nichols felt that such a broad view of this court's jurisdiction was violative of the intent of the Indian Claims Commission Act of 1946. He perceived, prophetically, that many would misunderstand what the court meant in attaching the consequences it did to a "wrongful course of government conduct." *Id.* 218 Ct.Cl. at 34, 586 F.2d at 206.

provements erected thereon during the said term by the said lessee, but said buildings and improvements shall remain a part of said land and become the property of lessor, excepting the office fixtures and records, personal property, tools, pumping and drilling outfits, boilers, engines, and mining machinery, which shall remain the property of the lessee and may be removed at any time prior to 60 days after the termination of the lease by forfeiture or otherwise provided the payments agreed upon by this lease have been made and the lease terms and regulations applicable thereto have been fully complied with * * *.[28]

The court finds nothing in this provision which requires the mines to be either closed up or filled in.

Section 3(c) of this lease also requires full compliance with regulations. Section 24 is the pertinent portion of the regulations and it states:

> *Surrender of Leased Premises in Good Condition.* On expiration of the term of a lease, or when a lease is surrendered, the lessee shall deliver to the Government the leased ground with the mine workings in good order and condition, and bondsmen will be held for such delivery in good order and condition, unless relieved by the Secretary of the Interior for cause. It shall, however, be stipulated that the machinery necessary to operate the mine is the property of the lessee, but that it may be removed by him only after the condition of the property has been ascertained by inspection by the Secretary of the Interior or his authorized agents, to be in satisfactory condition.

This section does not require that the mines be closed up or filled in.

The court notes that the drafters of the regulations were capable of expressly requiring certain closing safety precautions. Section 19 of the 1938 regulations dealt with the operation and maintenance of oil and gas wells. It required that all wells be plugged securely before they were abandoned. Clearly if the drafters had perceived it as necessary they could have required that the abandoned mines be filled in or boarded up. However, they included no such provision. Therefore, the court concludes that neither the language in the leases nor the regulations created a duty on the part of defendant to close up the abandoned mines.

Of course, it is not necessary to find the existence of language in a lease or applicable regulations to establish the standards of due care of a prudent trustee. The circumstances of time and place may in part create a standard with which the trustee must comply. *See* G. Bogert, *supra*, § 541. The circumstances surrounding the 29 assumedly abandoned mines prior to 1946 did not obligate defendant, as part of its fiduciary duty, to ensure that the mines in question were closed up.

First, most of the mines dug on the Navajo Reservation were adits, which are horizontal openings into the side of a hill or cliff. The record indicates that many of these adits were very shallow, though some tunneled into a hill or cliff up to 100 feet. The record also indicates that a few shafts or vertical holes were opened either to gain access to veins of ore or as ventilation shafts for adits. The record is unclear how many, if any, of these vertical openings were dug prior to 1946, though it appears that most of the mines on plaintiff's lands were adits. The court believes it reasonable to conclude that adits presented very little danger as far as falling down and injuring one's self. The danger of cave-ins existed, but overall the court finds the adits were relatively safe.

Second, the record preponderates in favor of a finding that most of the mines were located in desolate areas far from the dwellings of the Indians. They were not

---

**28.** The court notes that it is unable to ascertain satisfactorily whether the other leases contained comparable provisions, though the court assumes that they did. The leases submitted into evidence were in part very difficult to read and appeared to be incomplete. Under such circumstances the court has made all reasonable efforts to ascertain the facts regarding the leases.

located in areas where individuals were likely to explore the opening which would increase the potential for injuries caused by the mines. This is not to say that on occasion an individual Indian or an Indian family may have located near a mine area as close as ½ mile for a period of time. These isolated locations along with the horizontal character of many of the mines reduced the need to close up the openings. A finding that the manner in which the mines were dug (*i.e.,* horizontal) and that they were predominantly located in isolated areas is supported by a complete dearth of any evidence in the record regarding any type of injuries resulting from the fact that the mines were not covered up in some manner. Not only were there no injuries, but it appears that the Indians actually occasionally used the mines as shelter for themselves or their livestock. There was no evidence in the record indicating that plaintiffs or their land were damaged by the fact that the mines remained opened.

There is another factor that weighs against any duty on the part of defendant to close the mines. That factor is that, even if the mines could have been considered abandoned prior to August 13, 1946, the record indicates that many of them were reworked after 1946. This fact would indicate that the lessees anticipated such further mining. At a time in which manual labor with picks and shovels in these isolated areas moved the earth, a requirement that the mines be closed up when later mining was anticipated would appear overly burdensome. Such additional labor when combined with the minimal

risks inherent in the mines at issue would not seem to require of a "prudent man engaged in similar business affairs and with objectives similar to those of the trust in question." (G Bogert, *supra,* § 541) that he fill in or board up the mines. The record indicates that the trade practice prior to 1946 was, during periods of non-operation of a mine, to remove most equipment and to leave the mine open for future use. The objectives of these mining companies was clearly to maximize revenues. Defendant's actions were consistent with this trade practice. The objective of the relevant portion of defendant and plaintiff's trust relationship was to "realize the highest possible financial return to the tribe" which was similar to that of industry participants. That objective could not be met if a mining company was required to close up a mine it anticipated opening up again at a future date.[29]

Plaintiff also asserts that defendant's knowledge of the dangers of radon, a gas eminating from uranium, required it to act to cause the uranium mines to be closed up so that the potential for exposure to such a hazardous substance would be prevented. Though there is some evidence in the record that early studies linked continuous radon exposure with higher incidents of cancer, the studies seemed far from conclusive. Viewing on all the evidence before it, the court is convinced that defendant acted in a manner entirely consistent with its standard of care as a trustee in not ensuring that the mines be closed because of the

**29.** It is true that a 1930 Information Circular prepared by the United States Bureau of Mines identified certain dangers associated with abandoned open mines, similar to those discussed above, and recommended that mining companies generally take certain precautions to prevent injuries. This circular published more than 15 years prior to defendant's alleged failure to close up assumedly abandoned mines does indicate that defendant was aware at that time of the potential dangers associated with open mines. The Bureau of Mines, during this period, did not have any authority to enforce safety orders on any mines, Indian or non-Indian. The Bureau could only make recommendations. There is no evidence in the record of the

Tribal Council giving any consideration to sealing or blocking or filling in the mine openings prior to 1946 or any reasonable period thereafter or concerning itself with mine safety measures in general. There is no evidence in the record of any fears for safety of tribal members being voiced to the Tribal Council prior to 1946 or any reasonable period thereafter because of open mines on the reservation. Though defendant may have been aware generally of some potential dangers related to abandoned mines, after considering the specific facts relating to the mines at issue, the court concludes that defendant in 1946 acted at all times consistent with the applicable standard of care. *See* G. Bogert, *supra,* at § 541.

dangers of radiation during the period prior to August 13, 1946.

As stated earlier, a trustee's standard of care is determined by "the circumstances of time and place which surrounded the trustee when he took [or failed to take] the action in question." G. Bogert, *supra*, § 541. The record indicates that as of 1946, the studies regarding the potential health hazards relating to exposure to radioactive material were far from conclusive and certainly not at the forefront of concern. It is true that some studies identified a potential link between exposure to radioactive ores and a higher incidence of cancer in miners constantly exposed to the ores. However, defendant was dealing with a situation in which isolated mines, which might have contained radioactive ore, were going to lie idle for some undeterminable period of time. Under those circumstances the potential for constant exposure was minimal. It would appear that high concentrations of radon plus extended time exposure thereto would be necessary to constitute an unsafe condition. The totality of the record suggests that this combination did not exist relative to the mines in question on the reservation. The court concludes that given the facts surrounding the mines and the limited knowledge regarding radiation danger in 1946, defendant acted consistent with its standard of care relative to said mines.

Plaintiff relies primarily on studies performed after 1946 and knowledge acquired by defendant after that date to demonstrate the potential hazards associated with radioactive substances. It is clear to the court that post-1946 studies have conclusively established the potential ill effects of radioactive materials. However, a trustee's standard of care does not require him to be a prophet. G. Bogert, *supra*, § 541. Later developments do not determine a trustee's standard of care. *Id.* Therefore, given the degree of knowledge regarding the dangers of radioactive ores in 1946 and the isolated character of the mines, the court concludes that defendant did not violate its standard of care in failing to have the idled or abandoned mines filled in and boarded up.[30]

Finally, regarding defendant's failure to close up the abandoned mines, plaintiff alleges that defendant's failure to so act was motivated by self-dealing, *i.e.*, if the mining companies were not required to close up the mines defendant could keep its cost of uranium down. This allegation is entirely speculative and at best an inference unsupported by the record. The record provides no evidence that defendant's actions in not ensuring that the idled or abandoned mines were closed up were motivated by a desire to minimize its costs.

The court concludes in light of the above discussion that plaintiff is not entitled to damages to cover the costs of the remedial work required to close up the 29 mines opened prior to 1946 either because said mines were not abandoned until after 1946 and thus this court has no jurisdiction over the claim, or because defendant acted in accordance with the existing standard of care under the circumstances.[31] With a

---

**30.** The court notes that plaintiff again only averted to potential danger associated with the potential radioactive nature of the mines. While plaintiff emphasized post-1946 studies regarding the potential health hazards of radioactive material, it cited no instances of any increased incidence of cancer or other manifestations of radiation poisoning on the reservation to support its argument.

**31.** From a damages point of view, plaintiff, in any event, may arguably not be able to recover the $6,721,000 in remedial work costs. The Court of Claims has stated the general rule that: "Where the expense of restoration [remedial costs requested] exceeds the diminution in the market value of the property caused by the lessee's nonperformance, the diminution in fair market value is the proper measure of damage." *Dodge Street Building Corp. v. United States,* 169 Ct.Cl. 496, 499, 341 F.2d 641, 644 (1965) (as quoted in *Gila River Prima-Maricopa Indian Community v. United States,* 199 Ct.Cl. 586, 596, 467 F.2d 1351, 1357 (1972)). In this case plaintiff made no attempt at all to establish the diminution in value to its reservation lands caused by defendant's failure to close up the abandoned mines. The diminution in fair market value is the ceiling for restoration or repair costs. *Missouri Baptist Hospital v. United States,* 213 Ct.Cl. 505, 515, 555 F.2d 290, 295 (1977).

finding of no wrongful action prior to 1946, the court clearly has no jurisdiction over the 270 mines opened after 1946 based on even the broadest possible "continuous course of wrongful conduct" interpretations one may draw from *Navajo Tribe v. United States, supra,* 218 Ct.Cl. at 30, 586 F.2d at 204. The court further believes that, even if plaintiff had shown that some or all of the 29 mines dug prior to August 13, 1946: (1) had been abandoned, (2) that defendant had a fiduciary obligation to close them, and (3) that defendant had failed to do so, constituting wrongful conduct, a continuing wrong theory for extending this court's jurisdiction past August 13, 1946 would not encompass the 270 mines opened after 1946. The court perceives a continuing wrong in this case as defendant having a duty to close up a mine abandoned before 1946 and that duty continuing past that date. However, as for mines not opened until after 1946, defendant's wrongful conduct regarding any mines abandoned prior to 1946 is not sufficient to give this court jurisdiction over a distinct post-1946 group of mines.

The court recognizes that this view of what can be brought within this court's jurisdiction under a "continuous course of wrongful conduct" theory is more limited than the broad theory imaginable in *Navajo Tribe v. United States, supra.* However, the court finds its view consistent with that case if it is limited to its factual parameters. The court also perceives its

more limited view of the continuing wrong or claim basis for jurisdiction as more in line with the decision in *Gila River Pima Maricopa Indian Community v. United States,* 135 Ct.Cl. 180, 140 F.Supp. 776 (1956), relied upon heavily by the Court of Claims in its *Navajo Tribe* (218 Ct.Cl. 11, 586 F.2d 192) opinion.

In *Gila River* the Court of Claims was presented with a claim that clearly accrued prior to August 13, 1946, but the damages flowing from the claim continued past that date. The court ruled that the Indian Claims Commission had jurisdiction over the entire claim, including both pre- and post-1946 damages. The court pointed out the potential problems created by the Indian Claims Commission Act of 1946 as related to jurisdiction:

Where a tribe is suing on a claim involving the recovery of periodic installments of compensation such as rent under a lease, and several of the installments fell due and were unpaid prior to the passage of the Indian Claims Commission Act while others fell due and were unpaid subsequent to that date, the question arises as to whether or not, on a claim therefor filed in the Commission, that body has authority to render judgment for all such installments of unpaid rent up to the date of its final judgment, or whether its jurisdiction is or should be held to be cut off and limited to rendering judgment for only those installments due prior to August 13, 1946, so that suit

Plaintiff generally has the dual burden of proving both diminution in value and repair costs. *Id.* 213 Ct.Cl. at 515–16, 555 F.2d at 296. Having failed to prove the diminution in value, defendant argues that the court must consider that figure as zero. With zero as a ceiling on the cost of repairs, defendant argues that plaintiff is entitled to no recovery on its claim for remedial costs associated with the abandoned mines. *See generally id.,* 213 Ct.Cl. at 515–21, 555 F.2d at 296–99.

Plaintiff responds that the above-stated general rule that reasonable costs of restoration damages should be limited to the diminution in the market value of the property should not apply in this case. Plaintiff argues that the personal value that its lands hold to the Navajo Indians exempts plaintiff from the diminution rule. *See Commonwealth of Puerto Rico v. SS Zoe Coloc-*

*troni,* 628 F.2d 652, 674 n. 21 (1st Cir.1980). Plaintiff also asserts that, because there is no market for its land, the reasonable cost of restoring the land to its prior condition is the proper measure of damages without limitation by the diminution rule. *See Feather River Lumber Co. v. United States,* 30 F.2d 642, 644 (9th Cir.1929). It may be that the circumstances of some Indian valuation cases would warrant the application of an exception from the general rule limiting restoration damages. However, in view of the court's ultimate conclusion that this portion of plaintiff's claim is either beyond this court's jurisdiction or that defendant acted in a manner consistent with its fiduciary obligations, the court finds it unnecessary to decide whether the diminution rule should or should not have application under the circumstances at bar.

for the remaining installments must be brought in the Court of Claims. There is no express provision in the Indian Claims Commission Act one way or the other on this point, nor in the legislative history of the act insofar as we have been able to determine. It is the usual rule that a court once having obtained jurisdiction of the persons and subject matter of a suit, retains such jurisdiction for all purposes including the awarding of all damages accruing up to the date of judgment. This is a good rule and we find nothing that would prevent its application here. [*Id.* 135 Ct.Cl. at 186, 140 F.Supp. at 779.]

The Court of Claims in *Navajo Tribe* (218 Ct.Cl. 11, 586 F.2d 192) interpreted this language as stating: "[I]f a wrongful course of governmental conduct began before August 13, 1946 and continued thereafter, the Commission could properly take account of and award relief for the damages or injuries suffered after that date from the continuing course of conduct that began prior to that date." *Navajo Tribe v. United States, supra,* 218 Ct.Cl. at 20, 586 F.2d at 198. This *Navajo Tribe* (218 Ct.Cl. 11) language can be read to give this court jurisdiction over all claims for wrongful conduct similar or related to wrongful conduct which occurred prior to August 13, 1946, and which may have extended past that date.

This court prefers to read those passages from *Gila River* and *Navajo Tribe* as saying, if a claim regarding governmental wrongful action accrued prior to August 13, 1946, the court maintains jurisdiction over that claim regarding that wrongful act even if it and the damages and consequences flowing from it extend past August 13, 1946. The difference is that a claim regarding a particular wrongful act must have initially accrued prior to August 13, 1946, *i.e.*, a claim relating to a lessee's failure to pay rent under a lease both before and after the crucial date of August 13, 1946 or claims relating to the failure to close mines dug and abandoned prior to the critical cut-off date. The court's view of the continuing wrong basis of liability would not encompass a claim regarding the

270 mines dug and abandoned subsequent to 1946 because no claim as to those mines accrued prior to 1946 with the related conduct and consequences extending past that date. Agreeing with the view expressed by Judge Nichols in his concurring and dissenting opinion in *Navajo Tribe v. United States* (218 Ct.Cl. at 34, 586 F.2d at 206), this court does not think that the Court of Claims in either *Gila River* or *Navajo Tribe* intended a distinct pre-1946 wrongful act serve as a nexus and precedent sufficient to give this court jurisdiction over purely post-1946 matters. Thus the court concludes that plaintiff can have no recovery, in any event, on its claim as to the 270 mines, which claim did not accrue until after 1946.

### D. *Unpaid Uranium Issue*

It is undisputed in this case that uranium was extracted from the tailings of processed vanadium oxide mined from plaintiff's reservation during the period 1943–1946. Defendant purchased the tailings from the mining companies which had processed the mined vanadium oxide. Defendant then processed the tailings itself to extract uranium. It set up this process presumably to avoid creating a market for uranium which might have been detrimental to the secrecy surrounding the Manhattan Project. For a general history of the development of the use of uranium by the government see *Union Carbide and Carbon Corp. v. Nisley, supra.* In any event, defendant acquired 120,000 pounds of uranium oxide (a stipulated figure) from the tailings of vanadium oxide which originated from the Navajo Indian Reservation.

It is uncontested that plaintiff never received any compensation for the uranium taken from its lands. The leases approved by defendant provided that plaintiff was entitled to royalties based on the following provision:

10 percent of the gross sale price of all mineral products recovered and sold *except vanadium compounds which shall be subject to a royalty rate of 10 percent of the value of the vanadium oxide*

*or the equivalent in other compounds, contained in the ore * * * .* [Emphasis added.]

In the context of this issue of unpaid uranium oxide, the court reads this royalty provision as requiring a royalty of 10 percent (or 15 percent) of the value of the uranium removed from the vanadium oxide tailings.[32] Defendant breached its fiduciary obligation by failing to comply with the royalty provisions in the various leases. Based on its violations of the leases, defendant is now obligated to pay the Tribe the proper royalty amount. The issue that is presented to the court on this claim is thus a determination of the proper value to be placed on the 120,000 pounds of uranium oxide. Before addressing the valuation question there are several arguments by plaintiff that the court must face.

Plaintiff argues that its damages should not be limited to the royalties provided for in the leases. Plaintiff's expert (Clay T. Smith) stated in his "Rebuttal Report" that "since no miner [lessee] was paid for this material [120,000 pounds of uranium oxide] and no permission to remove it was obtained, the * * * calculation of royalty owed is not germane."[33] "The Navajo Tribe should receive full payment for all the uranium severed." (Exh. CS–200 p. 2) He opined that the "mine-mouth" value should be used. Plaintiff's expert felt that a figure of $3.25, per pound of uranium (which he later rounded off to $3.00), was a reasonable estimate of the value of uranium during the 1939 to 1946 period. Such a value essentially represented the minimum amount to cover the costs of extracting and delivering uranium from the ground.[34] Since defendant paid nothing for the 120,000 pounds of uranium it received, plaintiff contends that defendant saved itself at least $3.00 per pound of uranium. Such a savings multiplied by 120,000 pounds equals $360,000 in damages. Plaintiff also utilizes at various points in its submissions a damage figure of $391,248 ($3.25 × 120,284 pounds). However, its expert rounded the $3.25 figure to $3.00 and the court believes it is the latter figure which should control here. With the addition of interest on this figure covering a 40-year period, plaintiff's final damage claim on this issue exceeds $1.6 million.

█ The court rejects this proposed theory of damages. The royalty provisions in the mining leases in these cases clearly contemplated compensating plaintiff for the extraction of all mineral products recovered under the leases including vanadium oxide and other compounds found in the vanadium ores. The uranium acquired by defendant was one of the compounds extracted from the vanadium ores. Therefore, the court concludes that plaintiff's only source of compensation for this uranium was in the royalty provisions of the leases. The fact that the lessees themselves were only paid for the vanadium ores they extracted and not for the uranium acquired from vanadium tailings does not change this conclusion. Defendant failed to ensure that the royalties were paid and it must now compensate plaintiff for that failure to act. However, defendant need not pay plaintiff any more than the royalties it was entitled to, which is 10 or 15 percent (see *supra* note 31) of the value of the uranium. Based on this conclusion, the court is essentially left with no

---

**32.** Two of the leases (I–149–IND–3798 and I–149–IND 4225) provided for a royalty payment of 15 percent of the value of the compound and such a figure is utilized where appropriate in the computation of damages on this issue.

**33.** The record indicates that during the period of 1944–1946 some lessees may have been paid for uranium content in vanadium ores containing at least 0.75 of 1 percent (0.75%) uranium oxide. However, the grades of uranium contained in the vanadium ores from the reservation were far below this figure.

**34.** The court notes that the issue presented by this claim is the amount owed plaintiff by defendant for defendant's failure to compensate the Indians for uranium extracted from tailings of vanadium ore taken from the reservation. The claim surrounds a particular quantity (120,000 pounds) or uranium from a particular source (vanadium tailings). Based on these facts the court finds it inappropriate to base the value of this *particular* uranium on the cost to extract uranium directly from the ground.

proffered valuation amount from plaintiff for the uranium acquired by defendant from the vanadium tailings since plaintiff's $3.00 per pound figure represented the minimum cost of extracting uranium directly from the ground and delivering the ore to defendant. Such a figure cannot be said to be representative of the value of the uranium actually acquired by defendant.

Plaintiff also argues that defendant's failure to pay plaintiff for the uranium constituted either a taking or self-dealing. Under either theory plaintiff contends that it is entitled to the amount defendant "saved itself" by not acquiring the uranium on the open market as opposed to only the royalties provided for in the leases.

■ Under the facts in this case, the court finds that there was no taking or self-dealing by or on the part of defendant. The record clearly indicates that from 1940 to 1946 there was a very limited market for uranium. Other than limited use in the ceramics industry, defendant's Manhattan Project created the only real demand for uranium. There was no established price for uranium until the Atomic Energy Commission (AEC) set one in April of 1948. In the early 1940's uranium, as part of the vanadium tailings, was basically discarded as waste and had very little value except to defendant. *See Union Carbide and Carbon Corp. v. United States, supra,* 300 F.2d at 580. Since the tailings and the uranium compound contained in them were primarily considered waste, the court cannot find that defendant had the intent to take anything from the Indians. *See Sun Oil Co. v. United States, supra,* 215 Ct.Cl. at 770, 572 F.2d at 818.

■ Plaintiff points out, however, that at least two of the leases (Nos. 3798 and 4225) at issue contained a provision which stated: "All tailings of mine refuse shall be and remain the property of the Navajo Tribe of Indians and shall be stored upon land title to which is in the United States in trust for the Navajo Tribe." If that were the only language in the lease then perhaps an intent to take could be implied from the facts. *See id.* 215 Ct.Cl. at 770, 572 F.2d at

818. That provision states further, however, that "[t]he tailing may be retreated or remitted by the lessee during the term of the lease upon payment of the rate of royalty specified herein upon all minerals recovered." That language clearly indicates that the leases anticipated the removal of additional products from the tailings. In this case defendant's failure to ensure that the mining companies, which extracted the vanadium oxide from the tailings, paid the proper royalties "gives rise to a breach claim not a taking claim." *Id.* 215 Ct.Cl. at 770, 572 F.2d at 818. Therefore, there was no taking of vanadium oxide found in the tailings covered under the leases containing the above provision. If anything, an oversight on the part of defendant occurred regarding its duty to ensure that the proper royalties were paid under the leases, but no taking did occur. Under the leases which did not contain that ownership provision regarding the tailings, it can reasonably be concluded that the requisite intent to take did not exist due to the fact that uranium was primarily regarded as waste at that time.

Even assuming *arguendo* that there was a taking, plaintiff's proposed measure of damages is erroneous. The value of the ore does not indicate the amount which defendant (the taker) "saved itself" or benefited from the taking. *See United States v. Miller,* 317 U.S. 369, 375, 63 S.Ct. 276, 280–81, 87 L.Ed. 336 (1943). Plaintiff's "award cannot be enhanced by any gain to the taker." *Id.* In addition, the Court of Claims has stated that "[i]n arriving at just compensation there should be offset against the value of the thing taken * * * whatever enhancement in value may have resulted from the public work requiring the taking." *Dick v. United States,* 144 Ct.Cl. 424, 428, 169 F.Supp. 491, 494 (1959). Therefore, if a taking is found, the value of the uranium should be reduced by the amount that its value was enhanced by the government's demand due to the Manhattan Project. That would substantially limit plaintiff's recovery under a taking theory since the record indicates that the only

other demand for uranium was the miniscule requirements of the ceramic industry.

■ The court finds no self-dealing by defendant as well. Self-dealing has been described as the actions of a fiduciary in learning of an opportunity, preventing the beneficiary from getting it, and seizing it for himself. *Navajo Tribe of Indians v. United States, supra,* 176 Ct.Cl. at 509, 364 F.2d at 324. There is no doubt that defendant received a benefit, but it seized no opportunities from plaintiff. As stated above, absent defendant's demand, there was little or no market for uranium, especially of the grade found in plaintiff's vanadium tailings.[35] Defendant certainly did not seize an opportunity from plaintiff to achieve a greater return from its uranium on the open market. If defendant acquired uranium from ores from plaintiff's land, as it did, all plaintiff would be entitled to receive would be the royalty payments, to which the court acknowledges plaintiff is entitled.

Under the rule set out by the Supreme Court in *Nevada v. United States, supra,* the federal government's fiduciary obligation cannot always be tied to the fastidious standards of a private fiduciary. *Id.* 463 U.S. at 128, 103 S.Ct. at 2917. There are instances in which the federal government is required "to carry water on both shoulders" and it may be required to act to serve other governmental interests. This obligation to represent other governmental interest cannot be considered a "compromise" of its fiduciary obligations to the Indians in all cases. *Id.* 463 U.S. at 128, 103 S.Ct. at 2917. The facts surrounding defendant's actions in this case make this a

situation in which defendant's dual obligations cannot be considered a breach of its fiduciary duty. Defendant was acquiring uranium vital to the Manhattan Project. At the same time it seized no real benefit from plaintiff. However, though the court finds no self-dealing, defendant remains obligated to pay the proper royalties due the tribe and thus the court must determine the amount of said royalties.

Though the court has determined that this is not a "taking" case, it does view the discussion of valuation in such cases helpful in determining the amount due on this issue. First, a determination of amount due should be made in the context of the relevant time period, *i.e.,* 1943–1946. *United States v. Miller, supra,* 317 U.S. at 374, 63 S.Ct. at 280. Second, the royalty provisions in this lease require the payment of a certain percentage of the "value" of the ore (uranium). "Value" has been treated as synonymous with "market value" or "fair market value". *Id.* 317 U.S. at 374, 63 S.Ct. at 280. "[M]arket value is what a willing buyer would pay in cash to a willing seller." *Id.*

The record in this case clearly indicates that the only "market" of any significance for uranium was created by defendant. Defendant's Manhattan Engineering District entered into contracts with United States Vanadium (USV) to construct and operate two sludge plants. These plants manufactured uranium sludge or slime from the vanadium tailings which were otherwise considered waste.[36] Vanadium Corporation of American (VCA) and Metals Reserve Corporation (MRC) also produced this uranium sludge. The government

---

**35.** The reference to grades of uranium may be somewhat misleading. The various grades of uranium oxide actually represent the average amount of uranium oxide contained in a ton of ore. For example, the average grades of uranium oxide in the vanadium tailings from the reservation were between 0.22 to 0.32 percent. These figures indicate that there was between 0.22 to 0.32 of 1 percent of uranium in a ton of vanadium ore. As indicated in note 32, *supra,* some mining entities were paid for uranium if the vanadium ore contained at least 0.75 of 1 percent, referred to as 0.75 uranium oxide. The "grades" of uranium oxide in plaintiff's ores was

far below that 0.75 figure. The court assumes that "low grade" uranium oxide indicates that there is only a small amount of uranium in a ton or ore and thus the costs of extracting it become higher.

**36.** At the outset of the mining operations in the Colorado Plateau, the uranium content of carnotite ores was considered a valueless impurity processed into tailings or waste. *Union Carbide and Carbon Corp. v. United States, supra,* 300 F.2d at 580.

then either purchased the sludge from VCA and processed it into uranium oxide at its plants at Tandawanda and Monticello or USV purchased VCA's sludge and processed it along with its own sludge at USV's Grand Junction refining plant. All of these operations were kept entirely secret from 1943 to 1945 when defendant dropped the atomic bomb. Almost all of the uranium produced on the Colorado Plateau, or in the United States, for use by defendant, was produced from vanadium oxide tailings. Though defendant needed uranium for its defense efforts, and it provided the only significant market for uranium in the United States, it should be noted that defendant's domestic demand was not that great. Only 12½ percent of the uranium utilized by the Manhattan Project came from the Colorado Plateau. The remainder of the uranium utilized by defendant during the relevant time period came from the Belgian Congo which had higher grades of uranium ores.

With this information as a background, if a market value for uranium can be established it must be derived from this secret, relatively closed, market established by defendant in 1943. The market value would be what the willing buyer (defendant) would pay to the willing seller (USU and VCA) which entered into contracts to sell either uranium sludge or uranium oxide to the government. The record clearly indicates that the prices paid for uranium under existing contracts during the relevant period varied. The prices ranged from $.20

to $1.50 per pound for uranium oxide contained in the uranium-bearing tailings.

The reason for the variations in prices of the uranium oxide was the variation in grades of uranium found in the tailings. The record indicates that the uranium found in the tailings derived from the vanadium ores extracted from the reservation were very low-grade. In fact, some of the tailings were of such a low-grade that it was not considered feasible to reprocess some of the uranium oxide contained in the tailings which originated on the reservation. The record indicates that defendant paid $.20 per pound for the uranium which came from vanadium tailings from ores extracted from the reservation.[37] If all of the stipulated amount of 120,000 pounds of uranium was actually processed and the proper ore amounts are allocated between the leases requiring a 15 percent royalty and a 10 percent royalty, plaintiff is entitled to $2,539.03 in royalty payments.[38] This is assuming that all the vanadium tailings were reprocessed and all the uranium was recovered, which, the record indicates, was not the case.[39]

The $.20 figure mentioned above can reasonably be considered the "market value" per pound of the uranium contained in the low-grade vanadium ore tailings which came from plaintiff's lands. The market discussed above, although it was closed and secret, was in effect the only significant market for uranium at the time. It is

**37.** The court notes that in plaintiff's proposed valuation it places a great deal of emphasis on the cost of processing the uranium. In these cases, the government was bearing all the costs of production. Thus what defendant was willing to pay for the various grades of uranium was a clear reflection of the ore's value to the only primary willing buyer in the market.

**38.** In arriving at this royalty figure, defendant's expert utilized 119,933 total pounds of uranium oxide. He allocated 13,923 pounds to the 15 percent royalty leases and 106,010 pounds to the 10 percent royalty leases. He then calculated as follows: 13,923 × $.20 × 15% equals $417.69. To that he added 106,010 × $.20 × 10% which equals $2120.20, for a total of $2537.89. This figure was subsequently adjusted to $2539.03 to

take into account the fact that the parties stipulated to 120,000 pounds of uranium which necessitated adding 67 pounds to the royalty calculation.

**39.** It would appear inconsistent with any reasonable and proper market valuation theory to apply any other price per pound to the uranium found in ores extracted from plaintiff's property due to the ore's relatively low grade. The record indicates that the grades of uranium contained in the vanadium ores on the reservation ranged from 0.22 to 0.32 percent. (*See supra* note 34.) Ores with a grade of 1.65 percent, far in excess of the grades found in plaintiff's ores, were garnering only $.50 per pound. This fact makes the $0.20 figure appear reasonable.

arguable, however, that the character of the above-discussed "market" was such that it did not constitute the type of market from which a "market value" is generally determined. If it is not such a market, then the record indicates that no actual market existed, and "resort must be had to other data to ascertain its [the uranium's] value * * *." *United States v. Miller, supra,* 317 U.S. at 374, 63 S.Ct. at 280.

If the market created by defendant is deemed to be of such a closed nature that it should not be utilized to find the "market value," there are other factors the court can survey to ascertain value. One such factor is the demand for the particular uranium at issue. *See Monongahela Navigation Co. v. United States,* 148 U.S. 312, 328, 13 S.Ct. 622, 627, 37 L.Ed. 463 (1893). The facts in this case indicate that, absent defendant's need for uranium, there was little or no demand for uranium. The Belgian Congo was the primary source of high grade uranium in the world, and the domestic market appeared quite limited. Even adding defendant's needs for uranium, its demand for the low grade uranium,[40] like that extracted from plaintiff's lands, was not great. In fact, defendant's demand for domestic uranium from 1943 to 1946 was limited. It acquired only 12½ percent of its uranium for the Manhattan Project from the Colorado Plateau. *Union Carbide and Carbon Corp. v. United States, supra,* 300 F.2d at 581. Therefore, the demand for plaintiff's low grade uranium was severely limited during the relevant period.

Plaintiff points to the fact that when the AEC finally set a price for uranium in April of 1948, that price ranged from $.25 to $.30 per pound for "average ore", which was of a grade similar to that of the uranium found on plaintiff's reservation. Plaintiff's expert (Smith) pointed out that this price

was raised to $2.00 per pound for the same grade of ore by June 1948 in order to stimulate production. However, these prices were established after 1946 when the AEC began buying uranium in 1948. Value must be established during the relevant time period, and as of 1946 the AEC had not entered the uranium market.

Even if it is determined that no market existed from 1943–1946 from which a "market value" could be established, one cannot ignore the fact that defendant created the only real demand for the low grade uranium found in the tailings from the vanadium extracted from plaintiff's reservation. That being the case, the court finds it reasonable to utilize the $.20 per pound figure for plaintiff's uranium as the value of the uranium from which defendant owes plaintiff a royalty payment of either 10 or 15 percent (*see supra* note 31 and accompanying text). Based on the $.20 figure, the court concludes that plaintiff is entitled to a royalty payment of $2,539.03 on the unpaid uranium issue.

### E. *Tailings Hazard Issue*

Plaintiff's final claim is that defendant breached its fiduciary obligation to protect trust property by failing to clean up alleged dangerous mill tailings produced by four mills set up on the reservation. It is undisputed that four mills, approved by the AEC, were set up on plaintiff's reservation to process uranium. These mills were located at Shiprock, New Mexico; Monument Valley, Arizona; Mexican Hat, Utah; and Tuba City, Arizona. It is also clear from the record that these mills produced large piles of tailings containing uranium. Plaintiff contends that these mill tailing piles, which are still present on the reservation, constitute a health hazard, and it is entitled to between $53,000,000 and $118,600,000 to clean up the allegedly hazardous refuse.[41]

---

**40.** The fact that the uranium found in the vanadium tailings which originated from plaintiff's lands was low-grade, *i.e.,* low in concentration in the vanadium ore and thus more difficult to extract from the ores (*see supra* note 34), also reduces the value of the ore. *See Monongahela Navigation Co. v. United States,* 148 U.S. 312, 328, 13 S.Ct. 622, 627, 37 L.Ed. 463 (1893).

**41.** Plaintiff relies primarily upon defendant's fiduciary obligation as a trustee to protect and preserve trust property. Plaintiff alternatively argues that defendant's failure to ensure that the mill tailings were cleaned up was the product of self-dealing in that, if the mining companies had been required to dispose of the mill tailings, the cost of uranium to the government would have

Regarding this particular claim, it is concluded that it is outside the court's jurisdiction. The record makes it entirely clear that the first mill to commence operation on the Navajo Indian Reservation was the mill located at Shiprock, New Mexico. It became operational in 1954. The other three processing mills on the reservation became operational after that date. The Monument Valley, Arizona, mill became operational in 1955. The Tuba City, Arizona, mill commenced operations in 1956. The Mexican Hat, Utah, processing mill began operating in 1957. Obviously, until the mills became operational they could not produce tailings, which are waste by-products of processed ores. Until the tailings were produced, defendant had no obligation to ensure that they were cleaned up, if defendant had such an obligation at all.

■ It is clear that all of the events surrounding the production of the mill tailings commenced at least 7 to 8 years after August 13, 1946. No processing or milling of vanadium or uranium ores occurred on the Navajo Reservation prior to August 14, 1946. It was not until at least 1954 that this claim could have accrued. Therefore, it is beyond the jurisdiction of the court. *See Navajo Tribe v. United States, supra,* 218 Ct.Cl. at 17–18, 586 F.2d at 197.

Plaintiff apparently attempts to bring this claim within the confines of the court's jurisdiction utilizing the broadest possible perception of the continuing wrong theory, discussed previously in regard to the abandoned mines issue. Plaintiff apparently maintains the position that, since defendant established a program for the development of vanadium and uranium mining on the Colorado Plateau, including plaintiff's reservation, prior to 1946, all activities within that mining program subsequent to 1946 would be part of a continuing course of conduct and thus within the court's jurisdiction. This continuing course of conduct would include the infusion of the AEC's involvement in the uranium mining pro-

gram and the installation of processing mills on the reservation as well as the failure to close up the abandoned vanadium mines discussed *supra.*

■ This ultra broad presentation of a continuing claim clearly abuses the ruling in *Navajo Tribe v. United States, supra* (218 Ct.Cl. 11, 586 F.2d 192). The Court of Claims in that case stated: "[I]f a *wrongful* course of governmental conduct began before August 13, 1946 and continued thereafter, the Commission could properly take account of and award relief for the damages or injuries suffered after that date from the continuing course of [wrongful] conduct which began prior to that time." *Id* 218 Ct.Cl. at 20, 586 F.2d at 198. (Emphasis added.) There have been no allegations of any wrongful conduct on the part of defendant relating to the mills placed on plaintiff's land prior to August 13, 1946. The court finds that no wrongful conduct on the part of defendant existed by the mere commencement of the uranium mining program in 1942 or 1943. *See American Indians Residing on the Maricopa-Ak Chin Reservation v. United States,* 229 Ct.Cl. 167, 183, 667 F.2d 980, 990–91 (1982). Absent a showing of a continuous course of wrongful conduct commencing prior to August 13, 1946, and the court has found none either relating to the milling operations or any other aspect of the mining program, there is no basis for this court asserting jurisdiction on any type of "continuing claim" theory. *Id.* 218 Ct.Cl. at 30, 586 F.2d at 204. *See also American Indians v. United States,* 229 Ct.Cl. 167, 183, 667 F.2d 980, 990–91 (1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982).

■ Even assuming *arguendo* that the court has jurisdiction over this claim for clean up damages relating to defendant's failure to ensure that the mill tailings were properly disposed of, the court believes denial of this claim is warranted because a Congressionally mandated remedy is on the

been higher. Thus defendant, plaintiff alleges, acted to keep costs down to benefit itself to the detriment of plaintiff. There is no probative

evidence supportive of this assertion in the record before the court.

way. On November 8, 1978, Congress passed the "Uranium Mill Tailings Radiation Control Act of 1978." Pub.L. No. 95–604, 92 Stat. 3021 (1978) (codified at 42 U.S.C. §§ 7901–7942 (1983)). Section 7912(a)(1) of title 42 stated: "As soon as practicable, but no later than one year after November 8, 1978, the Secretary shall designate processing sites at or near the following locations * * *. Those locations include Mexican Hat, Utah; Shiprock, New Mexico; Tuba City, Arizona; and Monument Valley, Arizona, the four mill sites on plaintiff's reservation. The "Uranium Mill Tailings Radiation Control Act of 1978" is designed to dispose of the uranium mill tailings found at these designated sites due to the potential health risks associated with the tailings. 42 U.S.C. § 7901. The court concludes that the relief sought by plaintiff is forthcoming through this statute and thus, if the court had jurisdiction over this claim, it would be inappropriate to grant plaintiff's requested relief in that such an award could give rise to a double recovery situation for plaintiff. In essence, the statute, *supra,* supplies the relief plaintiff seeks from the court.[42] Plaintiff's weak response to this double recovery possibility is that Congress can preclude any such double recovery possibility if it were called to Congress' attention at the time appropri-

ations are considered for implementing the Radiation Control Act of 1978, *supra.* The court notes, however, that if the matter were not called to the attention of Congress, the possibility of a double recovery would indeed exist.

## F. *Interest Issue*

The final issue presented to the court is whether plaintiff is entitled to interest on the sums awarded. Plaintiff argues that it is entitled to interest on the damages received under its sand, rock, gravel and copper, and lease rental, exploration and unpaid uranium claims addressed in footnote 1, and sections A, B, and D of this opinion, respectively. Plaintiff does not seek interest on any damages it might be entitled to under its claims regarding the abandoned mines and the tailings hazard issues addressed in sections C and E of this opinion, respectively. It is now necessary to address plaintiff's claimed entitlement to interest on any damages awarded it herein.

Plaintiff concedes that interest on damage awards will be assessed against the United States only where the payment thereof is *expressly* provided for under a contract, treaty or Act of Congress. *United States v. Mescalero Apache Tribe,* 207 Ct.Cl. 369, 372, 518 F.2d 1309, 1311 (1975),

---

**42.** Based on the court's conclusion that it has no jurisdiction over this claim or that, assuming jurisdiction, the relief sought by plaintiff will be supplied by the provisions of 42 U.S.C. §§ 7901–7942 (1983), the court finds it unnecessary to address at length defendant's other arguments in support of its position that it breached no fiduciary obligation in failing to ensure that the tailings were cleaned up. Defendant asserts that its knowledge of the potential health hazards associated with the mill tailings was not developed until the 1960s and thus until that time it had no duty to take precautionary measures regarding the tailings. Defendant also asserts that plaintiff has not proven that anyone has been injured by the failure to remove the tailings or that the reservation was damaged in any way. As to plaintiff's claim that defendant's failure to require the disposal of the tailings was motivated by self-dealing in that no such requirement would keep the cost of uranium down for defendant, defendant argues that placing a clean up requirement in milling licenses would have detered mining companies from es-

tablishing mills on the reservation. If that was the case, plaintiff may not have received the royalties that it did.

It is true that plaintiff has not shown any damages resulting from the existence of the mill tailings on its lands. It has shown no injuries to the Indians or depreciation in its land values. The court is also persuaded that though defendant had some indications of the potential health hazards related to uranium, it was not until long after 1946 that it acquired sufficient knowledge to warrant a finding that it had a fiduciary obligation to ensure that precautionary measures be taken regarding the mill tailings. Finally, the record contains no evidence that defendant was motivated by self-dealing and to draw such an inference would be devoid of any evidentiary support in this record. However, though these arguments by defendant appear to have merit, based on the court's conclusion that it lacks jurisdiction over this claim, it need not either base its decision on these arguments or explore them any further.

*cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). In this case, plaintiff asserts that defendant was required to deposit both rental and royalty payments it received on behalf of the tribe into a trust account in the United States Treasury for the benefit of the Indians. The placement of these funds into a trust account for the benefit of plaintiff was required by Section 12 of the 1938 regulations and by 25 U.S.C. § 155 (1982), as amended. Plaintiff then points out that 25 U.S.C. § 161a (1982), as amended, requires the payment of interest at a rate of 4 percent on all such funds held in trust by the United States. Plaintiff thus concludes that the rule set out in *Mescalero Apache Tribe* is satisfied in that the payment of interest was required by statute. 207 Ct.Cl. at 392, 518 F.2d at 1323.

The court finds one serious flaw in plaintiff's argument. In *United States v. Mescalero Apache Tribe, supra,* the court was addressing the propriety of the payment of interest on funds already deposited in a trust account. In *Cheyenne-Arapaho Tribe v. United States,* 206 Ct.Cl. 340, 512 F.2d 1390 (1975), also relied on by plaintiff, the Court of Claims was addressing the issue of proper interest payments on funds already deposited into a trust account. Finally, there is the language of the statute itself, 25 U.S.C. § 161a. It states:

> All funds with account balances exceeding $500 *held in trust* by the United States and *carried in principal accounts on the books of the Treasury Department* to the credit of Indian tribes, upon which interest is not otherwise authorized by law, shall bear simple interest at a rate of 4 percentum per annum. [Emphasis added.]

This statutory language indicates that interest is only due on amounts actually held in trust and not those funds which should have been so deposited. Interest must be expressly provided for by statute or agreement (*United States v. Mescalero Apache Tribe, supra,* 207 Ct.Cl. at 392, 518 F.2d at 1323), and the court finds no express provision for interest on funds not already on deposit.

In *Coast Indian Community v. United States,* 213 Ct.Cl. 129, 550 F.2d 639 (1977), a case relied on by plaintiff, the court stated:

> It is true that 4 percent simple interest is usually awarded from the date of taking as part of the just compensation award required by the Constitution, where a determination of a taking is made. However, it is well established that interest from the date that the claim arises until date of judgment is not awarded as part of a recovery for breach of trust. The only exception to this rule is that prescribed by statute or express agreement. There is no agreement to this effect in this case. * * * Relative to a statutory exception, since 1929 25 U.S.C. §§ 161 and 161a (1970) have prescribed payment of 4 percent simple interest on proceeds of the sale of Indian trust lands on deposit in the United States Treasury, and these provisions have been the basis for recovery of interest on judgments in this court, when yet other statutes do not impair their effect. [Citations and footnotes omitted.] [*Id.* 213 Ct.Cl. at 157, 550 F.2d at 655.]

Commenting on this language from *Coast Indian Community,* first, the court has established that there was no taking in this case. Second, the Court of Claims in *Coast Indian Community* pointed out that generally interest is not awarded from the date a claim arises until the date of judgment on breach of trust claims unless provided for by statute which is consistent with this court's position. Third, the language in the *Coast Indian Community* opinion which refers to 25 U.S.C. §§ 161 and 161a being utilized to support recovery of interest on judgments can be reasonably read in light of other cases as referring to interest once the judgments are entered. *See Mitchell v. United States,* (Mitchell II) 229 Ct.Cl. 1, 16, 664 F.2d 265, 275 (1981), *aff'd,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *Cheyenne-Arapaho Tribe v. United States, supra,* 206 Ct.Cl. at 344, 512 F.2d at 1390. Finally, in any event, the Court of Claims in *Coast Indian Community v.*

*United States, supra,* refused to render an opinion on the plaintiff's entitlement to interest stating: "If the payment received was held in the United States Treasury in a trust account for *Coast Indian Community* members, or if it can be shown that part of a larger realized amount would have been so held, it may be that interest should be awarded under sections 161 and 161a." *Id.* 213 Ct.Cl. at 158, 550 F.2d at 655. Plaintiff interpolates from this hypothetical *dicta* a precedent for allowing recovery of interest in the cases at bar. It is felt plaintiff's reliance on the *Coast Indian Community* case is misplaced.

In *Mitchell v. United States, supra,* the plaintiff asserted, as does plaintiff in these cases, that defendant breached its fiduciary obligation to the Indians. In discussing plaintiff's request for interest on its claims, the Court of Claims in *Mitchell v. United States* stated:

> The proceeds actually paid to plaintiffs under the statutes construed in Part III, *supra,* obviously should include interest which should have been earned or allowed on those underlying proceeds. The payments made to the Indians are enhanced by previous interest proceeds just as they are reduced by administrative expenses properly chargeable. Plaintiffs are not entitled, however, to such interest on any unpaid amounts they may now recover in the present suit under Parts III and IV, *supra.* Those sums or their equivalent were never held by the Government for plaintiffs, were not subject to the specific interest provisions we have just discussed, and there is no statute awarding back-interest on such unpaid compensation now awarded by the court in this suit. 28 U.S.C. § 2516(a) (1976) allows "interest on a claim against the United States" in a judgment of this court "only under a contract or Act of Congress expressly providing for payment thereof." There is no more warrant for including back-interest in a judgment on claims for unpaid compensation in this case than in the myriad of other non-constitutional suits (including Indian claims) in which we can-

not award interest. [Citation omitted.] [229 Ct.Cl. at 16, 664 F.2d at 275]

This ruling directly rejects plaintiff's claim for interest. Plaintiff refers to this ruling regarding interest awards as *dictum.* The court does not agree with this assessment and instead views that ruling as a legal directive to the parties to guide them in further proceedings in that case. The force of this legal and binding decision by the Court of Claims in the *Mitchell* case, *supra,* completely subsumes the hypothetical dicta of the *Coast Indian Community* case, *supra,* relied on so heavily by plaintiff. In view of this holding in *Mitchell v. United States, supra,* any claim for interest by plaintiff on sums which apparently should have been but were not placed in trust for plaintiff's benefit must be denied. *See also Cleveland Chair Co. v. United States,* 214 Ct.Cl. 360, 369, 557 F.2d 244, 249 (1977); *United States v. Mescalero Apache Tribe, supra,* 207 Ct.Cl. at 408–09, 518 F.2d at 1333–34; *Nez Perce Tribe v. United States,* 176 Ct.Cl. 815, 829–30 (1966), *cert denied,* 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967). Therefore, plaintiff is not entitled to recover interest on the amounts the court has determined defendant must pay plaintiff in these cases. *See Northern Paiute Nation v. United States* 225 Ct.Cl. 275, 297 n. 20, 634 F.2d 594, 607 n. 20 (1980).

### III.

The court determines, for reasons set forth above, that plaintiff is entitled to recover $6,022.58 on the claims discussed in footnote 1 and sections A and D of this opinion. Plaintiff is not entitled to recover interest, as discussed in section F of this opinion, on the amounts awarded by the court on those claims. The court further determines that plaintiff is not entitled to recover on the claims discussed in sections B, C and E of this opinion. It is to be noted that these claims are not the only claims at issue in these consolidated cases. However, since there is no reason for delay relative to the entry of final judgment on these five claims, the clerk, pursuant to

Rule 54(b), is directed to enter a final judgment of $6,022.58 for plaintiff relative to said claims. No costs are to be assessed.